**COLUMBIA GAS TRANSMISSION CORPORATION**

v.

**ALLIED CHEMICAL CORPORATION, et al.**

Civ. A. No. 74–2951.

United States District Court, E. D. Louisiana.

April 26, 1979.

Frank J. Peragine, Deutsch, Kerrigan & Stiles, New Orleans, La., H. L. Snyder, Charleston, W. Va., for plaintiff.

Gene W. Lafitte, William R. Pitts, Liskow & Lewis, New Orleans, La., Ray A. Barlow, Hargrove, Guyton, Ramey & Barlow, Shreveport, La., Richard B. Wilkins, Jr., Houston, Tex., John M. McCollam, Gordon, Arata & McCollam, John V. Baus, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Dan A. Smetherman, Landwehr & Foley, New Orleans, La., for defendants.

## MEMORANDUM AND ORDER

JACK M. GORDON, District Judge.

Columbia Gas Transmission Corporation seeks injunctive relief, and damages for alleged wrongful diversion of natural gas from reserves claimed to have been "dedicated" to Columbia's interstate pipeline system by virtue of (i) two gas purchase contracts between the plaintiff and predecessor producer-lessees and (ii) certificates of public convenience and necessity issued by the Federal Power Commission ("FPC") [now entitled Federal Energy Regulatory Commission] to the predecessor producer-lessees. The plaintiff originally alleged six separate causes of action in its complaint which were as follows:

(1) That all defendants violated the provisions of the Natural Gas Act, 15 U.S.C. 717, et seq., by diverting gas originally dedicated to interstate commerce without first obtaining the permission and approval of the FPC to allow it to abandon services and facilities previously dedicated;

(2) That certain defendants have breached the Section 84 gas purchase contract by failing to give the plaintiff notice of their intentions to surrender any part of their leaseholds dedicated under the Section 84 gas purchase contract;

(3) That certain defendants breached the Section 85 gas purchase contract by failing to give the plaintiff notice of their intentions to surrender any part of their leaseholds dedicated under the Section 85 gas purchase contract;

(4) That defendants participated in an over-all scheme for the purpose of wrongfully and unlawfully depriving the plaintiff of its rights under the Section 84 gas purchase contract and the Section 85 gas purchase contract;

(5) That Allied Chemical Corporation committed constructive fraud on plaintiff by participating substantially in the scheme to deprive plaintiff of its rights under the Section 84 and Section 85 gas purchase contracts, and by failing to reveal to plaintiff this defendant's role in that scheme; and

(6) That defendants Moffett, the McWilliams Group, the Rankin Group, and Production Management Corporation committed constructive fraud on plaintiff by failing to reveal to plaintiff defendants' respective parts in the over-all scheme of defendants to violate plaintiff's rights under the Section 84 and Section 85 gas purchase contracts.

In this action, Columbia Gas Transmission Corporation (hereafter referred to as "Columbia Gas") has sued the following three groups of defendants:

(1) The producer-defendants who maintain or have maintained a working interest in the leaseholds under Section 84 and Section 85 and who are more specifically described as Allied Chemical Corporation ("Allied Chemical"), Petrofunds, Inc., Osias Biller, and Sunny South Oil & Gas, Inc., (all aforementioned defendants referred to as "Allied Chemical Group"); James R. Moffett, the McWilliams Group, the Rankin Group (the last three defendants referred to as the "Moffett Group"); and Mid-Continent Supply Company ("Mid-Continent");

(2) Defendants having only a royalty interest to some extent in the leaseholds under Section 84 and/or Section 85 who are specifically described as Pennzoil Producing Company ("Pennzoil") and W. L. Toce; and

(3) The intervenor-defendants who are the surface and mineral owners of Section 84 and Section 85 and who are more specifically described as the "Wylie Heirs."

Defendant Pennzoil has cross-claimed against defendants Toce and the Wylie Heirs, seeking indemnity for any damages it may be cast in judgment to pay relating to the alleged scheme or constructive fraud practiced on Columbia Gas.

Several developments occurred prior to and during the trial that have altered the complaint presented by Columbia Gas. First, Mid-Continent Supply Company moved for a summary judgment in its favor as to Counts I, II, III, IV, V and VI. Pennzoil also moved for summary judgment on Counts I, II, IV, V and VI. After consideration of these matters, the Court granted Mid-Continent Supply Company's motion for summary judgment as to Counts II, III, IV, V and VI, while reserving its ruling on Count I. The Court granted Pennzoil's motion for summary judgment as to Counts I, IV, V and VI, while reserving ruling on Count II. The Court later granted Pennzoil's motion as to Count II. The Court instructed the parties that it would issue written reasons supporting those orders granting the summary judgment motions as to certain counts.

Defendants in the Moffett Group also filed a motion for summary judgment as to Counts II and III. The Court took the matter under submission, and after hearing the evidence adduced at trial, orally granted the motion dismissing Counts II and III as to the Moffett Group. The Court stated that written reasons would follow.

In an oral motion at trial, plaintiff Columbia Gas moved to dismiss Counts IV and VI as to all party defendants. Also, in a trial stipulation entered into by all parties, Columbia conceded that if it did not recover

against the Moffett Group or Mid-Continent under the second and third counts of its complaint, it could not recover against the Allied Chemical Group under the same counts. Since the Court has previously ruled that no recovery lies as to the Moffett Group or Mid-Continent, under Counts II and III, the Allied Chemical Group is thus exonerated from liability as to the two counts. Columbia also stated that Count V only pertained to Allied Chemical Corporation.

To summarize for organizational purposes, this Court has before it the following trial issues:

(1) Whether the producer-defendants, Pennzoil, Toce and the Wylie Heirs, violated the abandonment procedure under the Natural Gas Act and thereby are liable under Count I;

(2) Whether Allied Chemical Corporation committed constructive fraud on plaintiff and is liable under Count V.

This Court will consider the above two issues in its Findings of Fact and Conclusions of Law, and upon completion of those findings and conclusions, will enter written reasons for summary judgment on the motions of Mid-Continent Supply Company, Pennzoil, and the Moffett Group.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of those issues under Count I and Count V was held April 18, 1977. The Court had before it only the issue of liability as to the above two counts. Subsequent to the trial, the parties were afforded the opportunity to present additional briefs. Once they were provided, the matter was taken under submission.

## FINDINGS OF FACT

1.

At all relevant times, Emily Wylie Keenan, Francis Wylie Condit and Evelyn Wylie Burton (the "Wylie Heirs") were the surface and mineral owners of Sections 84 and 85, Township 17 South, Range 16 East, Terrebonne Parish, Louisiana.

2.

On September 13, 1947, the Wylie Heirs and Lora C. Wylie granted to Union Producing Company an oil, gas and mineral lease covering all reserves under Section 84.

3.

On July 19, 1951, the Wylie Heirs granted to Shell Oil Company an oil, gas and mineral lease covering all reserves under Section 85.

4.

On December 16, 1952, Union Producing Company assigned its leasehold interest in Section 84 to the Weiner Group, reserving to itself and its successors an overriding royalty interest of $\frac{1}{32}$ of $\frac{7}{8}$. Pennzoil, as a successor to Union Producing Company, acquired this overriding royalty interest.

5.

On August 28, 1953, the Weiner Group, as owners of the original Section 84 lease, entered into a written contract with United Fuel Gas Company.

6.

On September 1, 1954, Shell Oil Company, the owner of the original Section 85 lease, entered into a written contract with United Fuel Gas Company.

7.

The rights and obligations of United Fuel Gas Company as buyer under both the Section 84 gas purchase contract and the Section 85 gas purchase contract are now owned by Columbia Gas Transmission Corporation, as successor by merger to United Fuel Gas Company.

8.

Under the terms of the Section 84 gas purchase contract, the producer-sellers agreed to sell and deliver to Columbia Gas as buyer all gas produced and saved from the lease on Section 84 attributable to the

sellers' interest therein, with certain nonrelevant exceptions.

9.

The Section 84 gas purchase contract was to remain in force and effect from the date of first delivery for twenty-one years and thereafter until the supplies of gas available to the pipeline would be so reduced that further operation of the pipeline in connection with the contract would become, in Columbia Gas' judgment, no longer profitable.

10.

Under the terms of the Section 85 gas purchase contract, the producer-sellers agreed to sell and deliver to Columbia Gas as buyer all gas produced and saved from the lease on Section 85 attributable to the sellers' interest therein, with certain nonrelevant exceptions.

11.

The Section 85 gas purchase contract was to remain in force and effect from the date of first delivery for twenty years and thereafter until cancelled. Either party could cancel the agreement at the end of twenty years or thereafter by giving to the other party at least six months' advance written notice.

12.

By orders issued December 15, 1954, at Docket Nos. G-4079 and G-4290, pursuant to § 7(c) of the Natural Gas Act, the FPC issued Certificates of Public Convenience and Necessity authorizing the respective lessee-producers under the Section 84 and the Section 85 gas purchase contracts to sell and deliver gas in interstate commerce to United Fuel Gas Company for resale, under the respective gas purchase contracts.

13.

Under the Commission's order, no reference was made to limiting the certificate to the terms of the gas purchase contracts, but rather, the Commission stated:

Certificates of public convenience and necessity be and are hereby issued authorizing the sales of natural gas by each of the Applicants designated above to United Fuel Gas Company as hereinbefore described, and the construction and operation of whatever facilities subject to the jurisdiction of the Commission may be necessary to consummate such sales or render such services, as more fully described in the applications in the respective Dockets, said sales being sales in interstate commerce of natural gas for resale for ultimate public consumption, subject to the jurisdiction of the Commission, upon the terms and conditions of this order.

14.

Since issuance of the FPC Certificates of 1954, the gas sold and delivered under both the Section 84 and Section 85 gas purchase contracts has been transported and sold at wholesale for resale in interstate commerce, for ultimate public consumption, under the aforementioned FPC certificates. This gas consisted of production at depths above 10,-600 feet subsea in Sections 84 and 85.

15.

In February of 1970, Mid-Continent acquired by assignment from Cromwell Oil, a predecessor producer-lessee, an undivided 1/8 working interest in the original Section 84 lease and the original Section 85 lease. Mid-Continent has never exercised its right to operate this leasehold interest and its sole participation herein has been to pay its share of costs as billed and to receive its proportionate share of proceeds in the sale of mineral production therefrom.

16.

By letters dated March 22, 1972; April 13, 1972; April 26, 1972 and December 26, 1972, the Wylie Heirs made formal demands on the then lessees and/or sublessees of the original Section 84 and Section 85 leases for further development of the lease premises.

**17.**

After the lessees and sublessees of Sections 84 and 85 failed to additionally develop the leaseholds, the Wylie Heirs made formal demand for the release of the undeveloped portions of said leases, and in particular, all reserves below 10,600 feet subsea. The releases requested by the Wylie Heirs were not forthcoming from the lessees and/or sublessees of Sections 84 and 85.

**18.**

On April 10, 1973, the Wylie Heirs filed suit in the State District Court in Terrebonne Parish against the then record owners of the original Section 84 and Section 85 leases, Southern Hydrocarbons Production Company, Inc., Mid-Continent, and others, demanding a release of all nonproductive acreage on the basis of nondevelopment. Pennzoil was not made a party to the suit and was not aware of its existence until after the lawsuit had been compromised and settled.

**19.**

The Wylie Heirs, as plaintiffs, filed a motion for partial summary judgment in the lease cancellation suit, seeking cancellation of the original Section 84 and original Section 85 leases as to the undeveloped deeper horizons below 10,600 feet, which motion was scheduled to be heard on October 26, 1973.

**20.**

The Moffett Group had entered into negotiations in August, 1973, with Southern Hydrocarbons Production Company, Inc., and Transnational Petroleum, Inc., relevant to acquiring the operating rights under the original Section 84 and original Section 85 leases, including the rights to production then being obtained thereunder. The contract was executed under date of August 23, 1973. The formal assignment was dated September 21, 1973, acknowledged October 15, 1973, and recorded in Terrebonne Parish on October 18, 1973. The Moffett Group paid $30,000.00 cash and 78,500 shares of common stock in McMoRan Exploration Company for the operating rights thus acquired, including the ⅞ working interest in the original Section 84 and Section 85 leases.

**21.**

Soon after the assignment of the ⅞ working interest in Sections 84 and 85 to the Moffett Group, negotiations were initiated by the Wylie Heirs in an effort to compromise and settle the lawsuit then pending. After several proposals were made, the parties to the negotiations agreed: (1) that the Moffett Group would release all rights to depths below the deepest sand then productive (10,600 feet subsea) and (2) that the Wylie Heirs' royalty interest would increase from ⅛ to ⅙ on all new production above 10,600 feet subsea, and the royalty interest of ⅛ was to remain unchanged on production from previously drilled wells. The Moffett Group found that it could agree to release its rights to those depths below 10,600 feet since it had acquired a ⅞ interest in Sections 84 and 85 primarily because of the known production and the possibility of reworking the producing wells. In exchange for the Moffett Group's concessions, the Wylie Heirs agreed to dismiss the suit for cancellation and to deliver one new lease covering all of Sections 84 and 85 as to depths above 10,600 feet subsea.

**22.**

Subsequent to the Moffett-Wylie negotiations, Mid-Continent, with its ⅛ leasehold interest in Sections 84 and 85, agreed to settle the lease cancellation suit on the same basis that was agreed to by the above parties.

**23.**

Pennzoil also agreed to release its interest in the original Section 84 lease in exchange for the granting of an overriding royalty interest of 1/32 of ⅞ in a new lease to be granted by the Wylie Heirs covering all of Section 84 and Section 85 down to a subsurface depth of 10,600 feet.

24.

Under date of October 29, 1973, the Moffett Group, Mid-Continent, and Pennzoil executed releases of the original Section 84 and Section 85 leases and the Wylie Heirs executed the new shallow gas lease to defendant Toce, as a leasing agent, with such lease covering all of Sections 84 and 85 down to a subsurface depth of 10,600 feet.

25.

Also under date of October 29, 1973, defendant Toce, as a leasing agent, executed the document of assignment to Pennzoil of an overriding royalty interest of 1/32 of 7/8 to the new shallow gas lease.

.

26.

Under date of October 31, 1973, defendant Toce executed the document of assignment of the new shallow gas lease in varying proportions to the Moffett Group and Mid-Continent.

27.

Under date of November 3, 1973, the Wylie Heirs executed the new deep gas lease to defendant Toce, covering all of Sections 84 and 85, limited to the depths below 10,600 feet subsea.

28.

Under date of November 3, 1973, defendant Toce executed the document of sublease of the new deep gas lease to Allied Chemical Corporation, reserving to himself an overriding royalty interest of 3.91%. Under date of January 8, 1975, Allied Chemical executed an assignment of portions of the working interest in the new deep gas lease to Petrofunds, Biller, and Sunny South, so that the entire working interest thereunder was then owned by the Allied Chemical Group in the following proportions:

| | |
|---|---|
| Allied Chemical | 76.1329% |
| Petrofunds | 21.6133% |
| Biller | 1.6496% |
| Sunny South | 0.6042% |
| | 100.0000% |

29.

Over the period March to July, 1972, and possibly at other times, Allied Chemical had communicated with representatives of the Wylie Heirs concerning a demand made by the Wylie Heirs for release of acreage in Sections 84 and 85, covered by separate leases held by third parties. Allied Chemical had on occasion informed representatives of the Wylie Heirs about the status of its seismic option agreement with those third parties.

30.

In September, 1972, representatives of Allied Chemical met with representatives of the Wylie Heirs in Lafayette, Louisiana, to discuss the acquisition of a canal right-of-way from the Wylie Heirs. During this meeting Allied Chemical was asked if it would be interested in acquiring a mineral lease covering Sections 84 and/or 85 in the event the landowners were successful in obtaining the cancellation or release of the leases then covering those sections. Allied Chemical replied that it might be interested in such proposal if the existing leases were cancelled or released.

31.

In late October, 1973, before the original Section 84 and Section 85 leases were released to the Wylie Heirs and before the new shallow gas lease was actually executed, defendant Toce informed Allied Chemical that the owners of the original leases covering Sections 84 and 85 had agreed to release their interests as to all depths below 10,600 feet subsea, and offered those mineral interests to Allied Chemical, subject to a landowner's royalty of 1/6 and an overriding royalty of 3.91%. Allied Chemical agreed to pay for the acquisition of such interests in the sum of $96,000.00. Prior to October 30, 1973, the members of the Allied Chemical Group made no formal or informal commitment to any party that they would acquire all or a portion of the lease rights to Sections 84 and 85.

### 32.

In May, 1974, the Allied Chemical Group completed a new gas well on Section 85, at a depth below 10,600 feet but denied any obligations to sell and deliver to Columbia any gas produced from Sections 84 and 85 at depths below 10,600 feet subsea. On October 10, 1974, Columbia formally demanded recognition of its right to purchase all gas produced from Sections 84 and 85 which demand was unequivocally rejected by the Allied Chemical Group as to gas produced from depths below 10,600 feet subsea. On October 11, 1974, Allied Chemical as operator of the new well declared to Columbia that it was taking immediate steps to commence production of deep gas from depths below 10,600 feet subsea and sell such gas in the intrastate gas market, and in fact, the Allied Chemical Group has so sold and delivered substantial quantities of such gas to Sugar Bowl Gas Corporation, in the intrastate market.

### 33.

By letter dated February 12, 1974, Allied Chemical notified Columbia of its election under Article 4, provision 8 of the Section 85 gas purchase contract, to cancel that contract as of December 21, 1974.

### 34.

To date, all of the producer-defendants have acknowledged their obligations to deliver to Columbia Gas the shallow gas produced at depths above 10,600 feet subsea. The Allied Chemical Group denies that it has any obligation under either the gas purchase contracts or the certificate of public necessity and convenience issued by the FPC to deliver to Columbia the deep gas produced at depths below 10,600 feet subsea.

### 35.

The Section 84 gas purchase contract contains the following provision:

> Seller agrees that it will not voluntarily surrender or permit to lapse any such lease or other interest unless it shall have first given Buyer 45 days' notice of its intention to surrender or permit the same to lapse and offered to assign its interest therein to Buyer without payment of any consideration therefor, except the value of any salvageable materials located thereon. Notwithstanding, however, Seller shall not be liable for any failure by reason of its inadvertence to give notice to Buyer of its intention to surrender or permit to lapse any such leasehold or other interest.

### 36.

The Section 85 gas purchase contract contains the following provision:

> Seller agrees that it will not voluntarily surrender or permit to lapse any lease or portion thereof or other interest committed under this agreement unless it shall have first given Buyer 30 days' notice of its intention to surrender or permit the same to lapse and offered to assign its interest therein to Buyer without payment of any consideration therefor except the value of any salvageable materials located thereon. Notwithstanding, however, Seller shall not be liable for any failure by reason of its inadvertence to give notice to Buyer of its intention to surrender or permit to lapse any such leasehold or other interest.

### 37.

The Moffett Group failed to give Columbia Gas notice of its intention to surrender its interest in the leasehold on Sections 84 and 85 to the Wylie Heirs in the latter part of October, 1973. The Moffett Group was not aware of its obligations under the gas purchase contract to notify Columbia Gas of its intention to surrender because no member of the Moffett Group or any of the employees or representatives had ever read the notification provisions of the contracts.

### 38.

Mid-Continent failed to give Columbia Gas notice of its intention to surrender its interest in the leasehold on Sections 84 and 85 to the Wylie Heirs in the latter part of

October, 1973. Mid-Continent was not aware of such obligations and no officer, employee, or representative had been a party to or had even seen a Section 84 or Section 85 gas purchase agreement. Additionally, Mid-Continent was never aware of any notification of surrender that its predecessor in interest, Cromwell Oil, gave to Columbia Gas when Mid-Continent acquired its interest in the leaseholds.

### 39.

Pennzoil failed to give Columbia Gas notice of its intention to surrender its interest in the leasehold in Section 84 to the Wylie Heirs in the latter part of October, 1973. Since Pennzoil acquired only a 1/32 of 1/8 royalty interest when it purchased the assets of Union Producing Company, Pennzoil never considered itself to be a party to the gas purchase contract entered by sublessees with Columbia Gas. Nor was Pennzoil aware of the pending suit for cancellation for nonproduction filed by the Wylie Heirs, nor was it made a party to that suit. Pennzoil never joined in any settlement discussions with the Wylie Heirs or other defendants. The first notification Pennzoil received of the pending suit and proposed settlement by release of certain leases was from a letter prepared by the attorney of the Wylie Heirs, urging that Pennzoil consider releasing any interest it had in the leaseholds on Sections 84 and 85.

### 40.

The present lawsuit was filed by Columbia Gas against all defendants other than the Wylie Heirs on or about October 10, 1974, and the Wylie Heirs were given leave to intervene as parties defendant on or about December 2, 1974.

### CONCLUSIONS OF LAW

Plaintiff, Columbia Gas, instituted suit under 15 U.S.C. § 717u for injunctive relief and damages against the defendants, alleging the wrongful diversion of natural gas from reserves underlying lands comprising Sections 84 and 85, Township 17 South, Range 16 East, Terrebonne Parish, Louisiana, which lands are now and have since 1947 been owned by the Wylie Heirs. Columbia Gas contends that said gas reserves were dedicated to its interstate pipeline system by virtue of two gas purchase contracts on Section 84 and Section 85.

Plaintiff sets out the thrust of its assertion that defendants have violated provisions in the Natural Gas Act, in Paragraph 16 of its complaint as follows:

. . . Under the provisions of the Natural Gas Act and the rules and regulations promulgated thereunder, all of the gas produced or to be produced from Sections 84 and 85 has been and continues to be dedicated to the interstate wholesale market requirements of United Fuel Gas Company and Columbia as its successor; and the Producer-Defendants and each of them and their successors are bound in law to honor that dedication. This obligation imposed by the Natural Gas Act and said rules and regulations promulgated thereunder can only be terminated by an order issued by the Federal Power Commission pursuant to Section 7(b) of the Natural Gas Act, 15 U.S.C. § 717f(b).

. . . .

Plaintiff's allegations are premised on the following contentions:

(1) That the sellers under the gas purchase contracts intended to dedicate to the buyer transmission company all developed and undeveloped reserves underlying Sections 84 and 85;

(2) That the FPC had the jurisdictional power and did issue a Certificate of Public Necessity and Convenience thereby dedicating all developed and undeveloped reserves underlying Sections 84 and 85 to the interstate gas market for an unlimited duration;

(3) That all defendants in Count I of the complaint were seeking to abandon services and/or facilities dedicated to interstate commerce.

All parties are in agreement that no order was obtained from the Federal Power Commission allowing any of the defendants the right to abandon services or facilities dedicated to interstate commerce.

At the time this matter went to trial in 1977, these issues were to a large extent controlled by the following cases, upon which the defendants relied: *Southland Royalty Company v. Federal Power Commission*, 543 F.2d 1134 (5th Cir. 1976); *Federal Power Commission v. Panhandle Eastern Line Company*, 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499 (1949); and *Frost-Johnson Lumber Company v. Sallings' Heirs*, 150 La. 756, 91 So. 203 (1922). In so relying, the defendants made four arguments why no abandonment order had to be obtained when certain defendants in turn released or assigned their mineral interests in Section 84 and Section 85 to other defendants.

First, the defendants suggested that only production gas and not undeveloped reserves can be dedicated to interstate commerce since one can only dedicate what one owns. Under Louisiana law, gas is insusceptible of ownership in its natural state with landowner or lessee only having the right to explore and to possess this mineral.

Second, the defendants contended that all undeveloped reserves below the 10,600 foot depth subsea come within the production and gathering exemption of 15 U.S.C. § 717(b) of the Natural Gas Act, and for that reason, are exempt from dedication and from the jurisdiction of the FPC.

Third, the defendants suggested that a seller-lessee under a gas purchase contract cannot dedicate into interstate commerce a greater right to the leasehold gas than the lessee itself has under its lease agreement with the landowners. Specifically, the dedication into interstate commerce must terminate at the same time that the seller-lessee's rights under the lease agreement end. The defendants contended that they could not be required to continue to dedicate to interstate markets gas which they did not own. Defendants urged that the seller-lessees' interests in Section 84 and Section 85 were validly terminated when these parties compromised a lease cancellation suit which well may have resulted in a judicial declaration of cancellation of the original Section 84 and original Section 85 leases, had the matter been tried. A condition of the com-

promise was that the seller-lessees were to release their leasehold interests in Sections 84 and 85. Contemporaneous with the legitimate termination of the seller-lessees' leasehold rights in Section 84 and Section 85 was the termination of Columbia Gas' accessory rights and those rights under dedication and subject to FPC jurisdiction. The Fifth Circuit in *Southland Royalty Company, supra*, set forth the premise, in the context of oil and gas leases dedicated into interstate commerce, that a seller-lessee could not dedicate rights in the gas greater than its own rights to that gas. (At p. 1137)

Fourth, defendants, Wylie Heirs, suggested that they could not be brought within the jurisdiction of the FPC and thereby be required to obtain an abandonment order, since they did not constitute a natural gas company under the Natural Gas Act.

Subsequent to the trial of this matter, and after the parties' post-trial memoranda had already been filed and the case taken under submission, the complexion of the third issue above underwent a radical change. First, the Fifth Circuit's decision in *Southland Royalty Company v. Federal Power Commission, supra*, upon which the defendants so strongly relied, was reversed by the United States Supreme Court sub nom. *California, et al. v. Southland Royalty Company*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505, reh. den., 439 U.S. 885, 99 S.Ct. 230, 58 L.Ed.2d 200 (1978). The Supreme Court's decision in *Southland* changed the posture of this case to one highly favorable to the plaintiff, Columbia Gas. However, no sooner was that decision received and digested by this Court than the United States Congress enacted the Natural Gas Policy Act of 1978 ("NGPA"), which Act created in § 2(18)(B)(iii) an exclusion from natural gas dedicated to interstate commerce, apparently designed to negate the precise effects of the Supreme Court's *Southland* decision. As a result of this confusion and its possible effect on the outcome of the present case, the parties were asked to file supplemental briefs outlining the potential impact of both the Su-

preme Court's *Southland* decision, and the NGPA, on the issues before the Court. Upon receipt and review of the supplemental briefs filed by counsel, as well as the *Southland* decision, the NGPA, and its legislative history, the Court concludes for the following reasons that plaintiff, Columbia Gas, is entitled to no recovery in this case.

Before considering in detail the arguments of the parties, it is significant to outline the pertinent statutory authorities under the Natural Gas Act which pertain to the dedication and abandonment of gas in interstate commerce.

The Federal Power Commission, the regulatory agency empowered with the authority to issue Certificates of Public Convenience and Necessity for the sale of natural gas in interstate commerce, derives its power from § 7(c) of the Act, as follows:

No natural-gas company . . . shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is enforced with respect to such natural gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations . . . . .

Once the facilities and services by which gas can be sold and transported in interstate commerce have been dedicated and placed under the jurisdiction of the FPC, then § 7(b) of the Natural Gas Act becomes pertinent should any natural gas company seek to remove these services or facilities from that dedication. Section 7(b) states:

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuation of service is unwarranted, or that the present or future public

convenience or necessity permits such abandonment.

In deciding whether the defendants were required to seek an order of abandonment to carry out those activities concerning Section 84 and Section 85, the Court must first answer two crucial questions: (1) whether the sellers and buyer under the gas purchase contracts intended to dedicate all reserves underlying Section 84 and Section 85, whether developed or not; and (2) whether the FPC issued a certificate of unlimited duration in dedicating those reserves intended to be provided under the gas purchase contracts. After consideration of the language in the gas purchase contracts, this Court is certain in its conclusion that the parties to those contracts intended to dedicate all reserves, whether developed or not. In Article I of the gas purchase contracts on Section 84 and Section 85, the lessee-seller states the following:

Seller further represents that all the leases covered by this contract are for terms of stated periods of years and as long thereafter as oil or gas is produced in paying quantities from the lands covered thereby and that said leases entitle Seller to sell or dispose of all gas produced from . the lands covered thereby attributable to Seller's interests therein except in some cases gas reserved by the lessor for domestic use only on the premises.

Since the Seller under its leasehold agreement had the right to explore and possess all gas and all reserves at all depths, this Court does not find the cited language, limiting the dedication to the interest of the Seller, to in any way restrict the contract to developed reserves. By the above clause, the parties were agreeing that Seller's leasehold would remain in effect as long as oil and gas is produced in paying quantities from the reserves underlying Sections 84 and 85, and that the Seller had the right to dispose of all gas in those very reserves. The Seller-Lessee was thus dedicating its right to produce all oil and gas underlying Sections 84 and 85 as long as such production could be continued in paying quantities. In sum, the parties to the gas pur-

chase contracts dedicated all gas underlying Section 84 and Section 85 to interstate commerce.

In arguing that the Certificate of Public Convenience and Necessity issued by the FPC was limited to the terms of the gas purchase contracts, the defendants refer this Court to the prefatory language of the Federal Power Commission's Findings and Order issuing Certificates of Public Convenience and Necessity pertaining to the mineral rights under Sections 84 and 85. The FPC stated:

> All sales are to be made in accordance with the respective contractual obligations.

This language is not included in the FPC's order nor does it state that the dedication is to be made in accordance with the respective contractual obligations. Rather, it states the obvious fact that the "sales" made in interstate commerce are to be made in accordance with the respective obligations of the parties as stated in the gas purchase contracts. Nowhere in the prefatory statement to the FPC's order does the Commission suggest the limit or term of its Certificate of Public Convenience and Necessity.

Upon examination of the Commission's order issuing the Certificates of Public Convenience and Necessity, the Court finds no reference anywhere in that order to any limitation of time which the certificate shall remain in force.[1] The United States Supreme Court in *Sun Oil Company v. Federal Power Commission*, 364 U.S. 170, 80 S.Ct. 1388, 5 L.Ed.2d 80 (1960) after examining a Commission order almost identical to the one in the present case, concluded that the certificate was a permanent one rather than a certificate issued for the term of the gas purchase contract. The Court there was also concerned with language in the application for the certificate which requested in effect that the sale of the natural gas be according to the parties' contractual obligations under the gas purchase contract. The Court found that such language was not incompatible with issuance of a permanent certificate. The Court reasoned:

> But we agree with the Commission that the 1956 certificate was a permanent one. The application itself, under the construction we have given the statute in Sunray, did not with any explicitness ask for a limited certificate. It asked for one "authorizing the sale of natural gas" under the 1947 contract; but as we said in Sunray, a permanent certificate would do that. See 364 U.S. [187] at page 149, 80 S.Ct. [1392] at page 1399. And the certificate issued makes no reference to any limitation of time. This is in contrast with explicit references to the limitation in those instances where the Commission had previously issued term certificates. The Commission's order, which blanketed the many applications before it in the

1. The FPC order states:

(A) Certificates of public convenience and necessity be and are hereby issued authorizing the sales of natural gas by each of the Applicants designated above to United Fuel Gas Company as hereinbefore described, and the construction and operation of whatever facilities subject to the jurisdiction of the Commission may be necessary to consummate such sales or render such services, as more fully described in the applications in the respective Dockets, said sales being sales in interstate commerce of natural gas for resale for ultimate public consumption, subject to the jurisdiction of the Commission, upon the terms and conditions of this order.

(B) The certificates herein granted shall be void and without force or effect unless accepted in writing by each Applicant within 30 days from date of issuance of this order.

(C) The certificates herein granted are not transferable and shall be effective only so long as Applicants continue the acts and operations hereby authorized in accordance with the provisions of the Natural Gas Act, and the applicable rules, regulations and orders of the Commission.

(D) The grant of the certificates herein shall not be construed as a waiver of the requirements of Section 4 of the Natural Gas Act, or of Section 154 of the Commission's Rules and Regulations thereunder requiring the filing of rate schedules for the services herein authorized; and is without prejudice to any findings or orders which have been or may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against Applicants.

mass proceeding, is no more explicit about limitation than the application, and refers, in fact, to the certificate as both "authorizing the sale" of natural gas, and authorizing a "service," which accords with our construction of § 7(e) in Sunray. Under these circumstances we would hardly see any basis for overturning the Commission's view that no limitation as to time was implied. Cf. *Andrew G. Nelson, Inc. v. United States,* 355 U.S. 554, 560, 78 S.Ct. 496, 499, 2 L.Ed.2d 484. (80 S.Ct. at 1391)

*See, Sun Oil Company, supra,* n.2, 80 S.Ct., pp. 1389–1390. Likewise, the order of the FPC in the present matter, while blanketing some of the application requests, does not make any specific reference to limitation of the certificate. As such, the Certificate of Public Convenience and Necessity dedicating the reserves underlying Section 84 and Section 85 was unlimited in duration.

■ Having concluded that the parties to the gas purchase contracts intended to dedicate all gas underlying Sections 84 and 85 to interstate commerce and that the FPC issued a Certificate of Public Convenience and Necessity which was of unlimited duration, thereby bringing the dedicated gas under the jurisdiction of the Commission, this Court must now address the four arguments of the defendants.

The defendants' first argument is that the undeveloped reserves underlying the leaseholds were never properly dedicated and thus not within FPC jurisdiction since neither the lessees nor the landowners own such reserves. *Frost-Johnson, supra.* The Supreme Court in *California v. Southland Royalty Co., supra,* responded to this very contention:

Respondents contend that the gas at issue here was never impressed with an obligation to serve the interstate market because it was never "dedicated" to an interstate sale. The core of their argument is that "no man can dedicate what he does not own." Respondents' Brief, at 8. This maxim has an appealing resonance, but only because it takes unfair advantage of an ambiguity in the term "dedicate." For most lawyers, as well as laymen to "dedicate" is to "give, present or surrender to public use." Webster's Third New International Dictionary 589 (1961). But gas which is "dedicated" pursuant to the Natural Gas Act is not surrendered to the public; it is simply placed within the jurisdiction of the Commission, so that it may be sold to the public at the "just and reasonable" rates specified by § 4 of the Act. Judicial review insures that those rates will not be confiscatory. [Citations omitted.] Thus, by "dedicating" gas to the interstate market, a producer does not effect a gift or even a sale of that gas, but only changes its regulatory status. . . . (98 S.Ct. at 1960)

■ Thus, under the seller-lessee's authority to explore and possess minerals underlying the leaseholds, the lessee had the power to place all reserves underlying the leaseholds within the jurisdiction of the Commission. Mineral ownership is not a prerequisite to dedication under the Natural Gas Act.

Defendants next contend that the undeveloped reserves were not capable of being dedicated and thus placed within the jurisdiction of the Commission since these reserves fall within the "production or gathering of natural gas" exemption to the Natural Gas Act set out in § 1(b). Section 1(b) reads in part:

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

The Supreme Court in *Panhandle Eastern Pipe Line Company, supra,* concluded that the practice in the natural gas industry of transferring undeveloped gas leases could

not be regulated by the Commission since such transfers were activities involving production and gathering of gas and thus outside of the jurisdiction of the Commission. Defendants suggest that the transfer of undeveloped reserves is also an activity involving the production and gathering of gas.

The Supreme Court subsequently narrowed its holding in *Panhandle, supra,* that the transfer of undeveloped leases was an activity of production and gathering. In *United Gas Improvement Company v. Continental Oil Company, et al.,* 381 U.S. 399, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965), the Court stated:

> The language of Panhandle is unquestionably broad. But flat statements such as "[o]f course leases are an essential part of production," 337 U.S. [498], at 505, 69 S.Ct. [1251] at 1256 [93 L.Ed. 1499], should not be taken to cover more than the particular kind of leases that were before the Court; it should not be considered as embracing each and every transfer that can be put in lease form. . . . (85 S.Ct. at 1524)

The Fifth Circuit has considered the question of whether undeveloped reserves can be dedicated into interstate commerce under the Natural Gas Act and has held that such reserves can be so dedicated. Implicit in that decision, of course, is that such undeveloped reserves do not come within the production and gathering exemption. In *Mitchell Energy Corporation v. Federal Power Commission,* 533 F.2d 258 (5th Cir. 1976), petitioner Mitchell Energy Corporation purchased all of The Gray Wolfe Company's mineral interest in the Pinehurst Field. Gray Wolfe had entered a contract to sell natural gas to Tennessee Gas Pipe Line Company for interstate transmission. In that contract, Gray Wolfe dedicated all gas in, under, and that may be produced from its interest in its leaseholds and units from all horizons in the Pinehurst Field. At the time that Mitchell Energy Corporation purchased the interest in the Pinehurst Field, a small producer certificate issued by the FPC remained in effect though the gas

purchase contract between Gray Wolfe and Tennessee had expired. Mitchell Energy Corporation thereafter filed an application for a temporary certificate of public convenience and necessity to sell Pinehurst natural gas to Tennessee. In that application, however, Mitchell Energy Corporation sought to continue service only from wells existing when the gas purchase agreement terminated and from sands producing at the time of the application. Tennessee sought to intervene in the Commission proceedings to urge that Mitchell Energy Corporation be required to rededicate all reserves underlying the Pinehurst Field. The Fifth Circuit in reviewing the Federal Power Commission's ruling that Mitchell had to continue the sale of gas to Tennessee from all depths of all wells drilled or to be drilled on the Pinehurst acreage, held that the original dedication was of all gas and this had to be honored unless relieved by Commission authority. The Court stated:

> From the foregoing we are convinced that by its 1954 certificate Gray Wolfe dedicated all available gas in the Pinehurst Field to interstate commerce. Mitchell has assumed Gray Wolfe's obligations. Thus, until relieved of that obligation by appropriate action of the Commission, Mitchell must continue to put in interstate commerce all the gas produced in the Pinehurst Field. . . . (533 F.2d at 261)

The Fifth Circuit found that all reserves whether developed or undeveloped were properly dedicated to interstate commerce though confronted by the argument of Mitchell that undeveloped reserves could not be dedicated since exempted from the Act by the production and gathering clause. (See initial brief of Mitchell Energy Corporation submitted to the Fifth Circuit.)

On the force of the holding in *Mitchell Energy Corporation, supra,* this Court concludes that the undeveloped reserves could be and were placed under FPC jurisdiction through dedication and thus do not come under the production and gathering exemption in § 1(b) of the Act.

The Court now turns to the third argument of the defendants, that is, that a seller-lessee under a gas purchase contract cannot dedicate into interstate commerce a greater right to the leasehold gas than the lessee itself has under its lease agreement with the landowners, and therefore the dedication into interstate commerce must terminate at the same time that the seller-lessee's rights under the lease agreement end. This position of defendants was originally well-founded when the case was submitted and the Fifth Circuit's decision in *Southland Royalty Company v. Federal Power Commission*, 543 F.2d 1134 (1976), was law. However, that decision was subsequently reversed by the United States Supreme Court on May 31, 1978.

In *California, et al v. Southland Royalty Co.*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978), reh. den., 439 U.S. 885, 99 S.Ct. 230, 58 L.Ed.2d 200 (1978), the Court was dealing with two 50–year fixed-term mineral leases. The seller-lessees had "dedicated" the natural gas governed by those leases to interstate commerce through sales contracts and FPC certificates of necessity of unlimited duration. The leases expired in 1975, and under local law the seller-lessee's interest in the leases reverted to Southland Royalty Company, among others. Just prior to expiration of the leases, Southland arranged to sell the remaining casinghead gas to an intrastate purchaser, at the higher prices available in the intrastate market. One of the customers under the original gas sales contract therefore sought to preserve its source of supply by filing a petition with the FPC seeking a determination that the remaining gas reserves could not be diverted to the intrastate market without abandonment authorization pursuant to § 7(b) of the Natural Gas Act. The FPC agreed with the customer, El Paso, and held that Southland could not, upon termination of the lease, sell gas in intrastate commerce without first seeking § 7(b) abandonment authority. Thus, the FPC issued an order continuing delivery of natural gas to the interstate customer, El Paso, pending judicial review of its decision. However, language was inserted in the order such that, were the FPC's decision to be ultimately reversed, this continued flow of natural gas into interstate commerce would not itself be considered a "dedication" to interstate commerce. 54 F.P.C. 2821 (1975).

The Fifth Circuit reversed the FPC at 543 F.2d 1134 (1976), and held that a seller-lessee, as a tenant for a term of years, could not legally dedicate that portion of the gas which Southland and others might own upon expiration of the lease. This, then, was the position that the defendants herein took when the present matter went to trial. The defendants argued that the leases were validly terminated when the parties compromised the lease cancellation suit, and that the gas interests below 10,600 feet subsea reverted to the Wylie Heirs as a matter of law; thus, the dedication of that portion of the gas covered by the original leases ceased, and neither the Wylie Heirs, nor the Allied Chemical Group was under any obligation to continue gas sales to Columbia Gas. Indeed, no sales of the gas below 10,600 feet subsea were ever made in interstate commerce. This argument was, of course, coupled with the two addressed above, as well as the fourth argument of the Wylie Heirs, i. e., that as landowners they did not constitute a natural gas company under the Natural Gas Act, and therefore could not be required to seek § 7(b) abandonment authority.

Unfortunately for the defendants, while this case was still under submission, the United States Supreme Court reversed the Fifth Circuit, and held that the original decision of the FPC was the correct one. The Court stated at 98 S.Ct. 1959:

> This issuance of a certificate of unlimited duration covering the gas at issue here created a federal obligation to serve the interstate market until abandonment had been obtained. The Commission reasonably concluded that under the statute the obligation to continue service attached to the gas, not as a matter of contract but as a matter of law, and bound all those with dominion and power of sale over the gas, including the lessor to whom it reverted. Just as in Sunray, the service

obligation imposed by the Commission survived the expiration of the private agreement which gave rise to the Commission's jurisdiction.

This analysis also adversely resolved the argument of the Wylie Heirs:

> Respondents also appear to argue that they should not be viewed as "natural gas companies" with respect to the Waddell Ranch gas because they had not voluntarily committed any act that would place them within the Commission's jurisdiction. As we have seen, this argument is somewhat beside the point, for the obligation to serve the interstate market had already attached to the gas, and respondents became obligated to continue that service when they assumed control of the gas. In the Commission's language, "the dedication involved is not the dedication of an individual party or producer, but the dedication of gas." 54 F.P.C., at 149, 10 P.U.R. 4th, at 348. (98 S.Ct. at 1960)

Thus it seemed that the matter was conclusively decided in favor of Columbia Gas, and that all that remained was to determine which of the defendants had actually "abandoned" the interstate service without FPC authority.

In *Reynolds Metal Company v. Federal Power Commission,* 175 U.S.App.D.C. 177, 534 F.2d 379 (1976), that Court defined abandonment within the meaning of § 7(b) of the Natural Gas Act as an act by a natural gas company which permanently reduces a significant portion of a particular service dedicated to interstate markets. The Supreme Court in *California, et al v. Southland Royalty Co., supra,* distinguished conduct constituting an abandonment with conduct that would only shift responsibilities of carrying out services dedicated to interstate commerce:

> . . . Private contractual arrangements might shift control of the facilities and thereby determine who is obligated to provide that service, but the parties may not simply agree to terminate the service obligation without the Commission's permission. (98 S.Ct. at 1960)

In considering these standards against the factual background present in the record, this Court concluded that the Moffett Group, Mid-Continent, and Pennzoil by their contractual arrangements, only shifted control of the facilities and thereby the obligation to continue the service to the Wylie Heirs, while the Wylie Heirs, Toce, Allied Chemical, Petrofunds, and Sunny South intended to place the specified reserves into the intrastate market.

The Moffett Group, Mid-Continent, and Pennzoil released their interests in the reserves below 10,600 feet subsea under the leaseholds in an effort to compromise the lease cancellation suit. Their sole interest in making the release was to protect their leasehold interests in the reserves above 10,600 feet subsea and not to divert the dedicated reserves to intrastate commerce. There was no understanding amongst these three parties that the release of their leasehold interests was for the purpose of terminating the service obligation without the Commission's approval. None of these parties benefited from the later activities resulting in the removal of the reserves below 10,600 feet from interstate to intrastate markets. Upon examining the practical effect of the three parties' action, the intent behind these actions, and the extent of the benefit derived from these actions, this Court concluded that their release of the specified reserves did not constitute abandonment within the meaning of the Act, but only a shifting of control over the services dedicated. As such, the Moffett Group, Mid-Continent, and Pennzoil were not required to seek FPC approval to release these leaseholds and thus were not in violation of the Natural Gas Act.

The actions of the Wylie Heirs, Toce, and the Allied Chemical Group were taken with the clear intention to place the reserves below 10,600 feet subsea into the intrastate market. The effect of their acts was to terminate the service obligation as defined by the Supreme Court in *Southland, supra,* without the Commission's permission. Thus, the Wylie Heirs, Toce, and the Allied Chemical Group had apparently violated the provisions of the Natural Gas Act by failing

to obtain FPC approval before abandoning the services to the interstate market. It seemed that judgment was going to have to be entered in favor of Columbia Gas, when yet another interesting development occurred. Enter the Natural Gas Policy Act of 1978 (NGPA).

A model of clarity the NGPA is not. It was assessed by the Office of Enforcement of the FERC (successor to the FPC) on August 14, 1978, as being " . . . so complex, ambiguous and contradictory that it would be virtually impossible for this Commission to enforce it in a conscientious and equitable manner." See, 124 Cong. Rec., No. 168–Part III, p. H13108 (daily ed. October 14, 1978). However, one aspect of the NGPA is astoundingly clear, and that is its intent to stop the Supreme Court's *Southland* decision dead in its tracks.

Under the definitions section of the Act, the term "committed or dedicated to interstate commerce" is treated in § 2(18) as follows:

(18) Committed or Dedicated to Interstate Commerce.—

(A) General Rule.—The term "committed or dedicated to interstate commerce", when used with respect to natural gas, means—

. . . . .

(ii) natural gas which, if sold, would be required to be sold in interstate commerce (within the meaning of the Natural Gas Act) under the terms of any contract, any certificate under the Natural Gas Act, or any provision of such Act.

(B) Exclusion.—Such term does not apply with respect to—

. . . . .

(iii) natural gas which, but for this clause, would be committed or dedicated to interstate commerce under subparagraph (A)(ii) by reason of the action of any person (including any successor in interest thereof, other than by means of any reversion of a leasehold interest), if on May 31, 1978—

(I) neither that person, nor any affiliate thereof, had any right to explore for, develop, produce, or sell such natural gas; and

(II) such natural gas was not being sold in interstate commerce (within the meaning of the Natural Gas Act) for resale (other than any sale described in clause (i)(I), (II), or (III)).

This language appears to this Court to mean that "dedicated" gas will include any gas dedicated either by contract or by FPC certificate to interstate commerce, but *only if,* on May 31, 1978, *either* (1) the person who dedicated the gas, or an affiliate or successor in interest, still has the contractual right to pursue the gas, *or* (2) the gas is still flowing in interstate commerce. This interpretation is supported by the legislative history found at pp. 71–72 of the Conference Report, which reads:

The conferees intend that the term "successor in interest" shall exclude any interest owner who acquires his right pursuant to the reversion or any other termination of a natural gas leasehold interest, or any subsequent grantee of such interest owner who acquires his interest after the date of such reversion or other termination.

The exclusion described in paragraph (C) above limits further extension of the holding of the Supreme Court in *California et al. v. Southland Royalty Co. et al* [436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505] (Slip Opinion No. 76–1114, decided May 31, 1978). The case is not, however, reversed on its facts.

Under the exclusion, certain natural gas is not to be considered committed or dedicated, if such natural gas is committed or dedicated by reason of the action of any person and neither that person (or any successor in interest thereof) nor any affiliate, on May 31, 1978, had any right to explore for, develop, produce, or sell such natural gas. If the right to explore is vested in any other person by means of any reversion of a leasehold, such other person is not to be considered a successor in interest, and thus the natural gas

would not be considered committed or dedicated, unless the gas is also sold in interstate commerce (within the meaning of the Natural Gas Act) for resale on May 31, 1978.

Several examples may be helpful. Seller A commits natural gas to interstate commerce in 1950. On May 31, 1978, Seller B, Seller A's successor in interest, has the right to explore for, develop, produce, or sell such natural gas. The natural gas remains committed or dedicated to interstate commerce.

Seller C is a lessee, who commits natural gas under a leashold (sic) interest to interstate commerce in 1950. In 1971, the lease reverts to Seller D, and Seller D terminates the sales in interstate commerce. No natural gas from the lease is sold in interstate commerce for resale on May 31, 1978. Such natural gas is excluded from the definition of committed or dedicated. However, if Seller D had sold such natural gas in interstate commerce for resale on May 31, 1978, such natural gas would be committed or dedicated under the definition.

It is abundantly clear from the cited comments that the exclusionary language was expressly designed to limit the applicability of the Supreme Court's *Southland* decision to its facts. Remember that in *Southland,* although the seller-lessee who originally dedicated the gas by virtue of FPC certification no longer had any contractual right to pursue the contested gas, the gas itself was still flowing in interstate commerce pursuant to the FPC's interim order. Thus the *Southland* gas would not have been able to meet the two-pronged test of § 2(18)(B)(iii) to escape FPC jurisdiction.

On the other hand, the gas presently in contest before this Court, does meet that test.

The seller-lessees here, who originally committed the gas reserves of Section 84 and Section 85 by contract, and dedicated those reserves by certification, no longer had the right, on May 31, 1978, to pursue any gas located below 10,600 feet subsea as a result of the compromise of the lease

cancellation suit. The rights to the gas in those reserves had reverted to the Wylie Heirs, and had thereafter been leased to the Allied Chemical Group. Unquestionably, the gas produced from those reserves was not being sold in interstate commerce on May 31, 1978.

Columbia Gas, however, argues that: (1) partial cancellation of a natural gas lease in voluntary compromise of a lawsuit does not constitute a "reversion" of the leasehold interest such as to prevent either the Wylie Heirs, or the Allied Chemical Group, from being considered a "successor in interest" to the original seller-lessees, and (2) the two different levels of gas reserves cannot be separated from each other, and since the gas located above 10,600 feet *was* flowing in interstate commerce on May 31, 1978, the second requirement of the exclusionary clause is not met. These two arguments are without merit for the following reasons.

As stated above, the NGPA itself is not a model of clarity, and extensive debate was had on the House floor concerning the apparent ambiguities of the Act, during the course of which the chairman of the subcommittee which drafted the NGPA, Congressman Dingell, had this to say:

> However, as indicated on page 71 of the Statement of Managers, the term "successor in interest" excludes "any interest owner who requires his right pursuant to the reversion or any other termination of a natural gas leasehold interest, or any subsequent grantee of such interest owner who acquires his interest after the date of such reversion or other termination." Thus the term "reversion", as utilized in section 2(18)(B)(iii) is intended to include any process by which a natural gas leasehold interest *or part thereof* terminates and the lessee loses the right to explore for, develop, produce or sell natural gas from the acreage formerly covered by *such lease or part thereof.* Such processes include termination by *voluntary release,* by *a judicial cancellation decree,* or under the provisions of a lease which require termination if production is not established or if production is not maintained in paying quantities.

Thus, *the successor in interest chain is intended to be broken upon reversion of the leasehold interest to the landowner.* The term would then not apply to either the landowner, or a subsequent lessee who is not affiliated with the person by whose action the gas was dedicated to interstate commerce. (emphasis supplied) (Oct. 14, 1978, Cong.Rec., H13116)

Thus, it is clear that the precise situation which occurred here, namely, a partial cancellation of a natural gas lease by voluntary release, in the face of a lawsuit for judicial cancellation, with reversion of the leasehold interest to the landowner, was expressly intended to be covered by the exclusionary clause of § 2(18)(B)(iii). Furthermore, since a partial release of gas rights is authorized, and it is the *released* gas which must be flowing on May 31, 1978, to defeat exclusion, the second argument of the plaintiff also fails.

The final alternative argument that Columbia Gas makes is that the exclusion of § 2(18)(B)(iii) is only effective December 1, 1978, since that is the effective date of the NGPA under § 601(a)(1)(A). Hence, they argue, under the Supreme Court's Southland decision, they are entitled to receive a payback of all gas wrongfully diverted up until December 1, 1978. This argument is also without merit.

Section 601 of the NGPA is found under Title VI of the Act, entitled "Coordination with Natural Gas Act; Miscellaneous Provisions." Section 601(a)(1)(A) reads as follows:

Sec. 601. Coordination with the Natural Gas Act.

(a) Jurisdiction of the Commission Under the Natural Gas Act.—

(1) Sales.—

(A) Natural gas not committed or dedicated.—For purposes of section 1(b) of the Natural Gas Act, effective on the first day of the first month beginning after the date of the enactment of this Act, the provisions of the Natural Gas Act and the jurisdiction of the Commission under such Act shall not apply to natural gas which was not committed or dedicated to interstate commerce as of the day before the date of the enactment of this Act solely by reason of any first sale of such natural gas.

The explanation of this rather oblique paragraph, with reference to *Southland* type gas, is found at p. 123 of the Conference Report:

Natural gas not committed or dedicated to interstate commerce as of the day before the date of the enactment of this Act is never made subject to the Commission's jurisdiction under sec. 1(b) of the Natural Gas Act.

Of course, under § 2(18)(B)(iii) of the NGPA, natural gas which, as here, meets the necessary qualifications on May 31, 1978, is considered "not committed or dedicated" as of that date, and hence is not committed or dedicated prior to the enactment of the NGPA. Thus, prospectively at least, there is no FPC, or FERC, § 1(b) jurisdiction over such gas, and hence, no wrongful diversion without § 7(b) abandonment authority, such as to initiate a payback requirement. But what about possible "technical violations" occurring prior to May 31, 1978? The Court finds that there is no payback requirement in that event either.

In his explanatory remarks on the House floor, Congressman Dingell stated the following:

Moreover, one further point should be considered. While the Southland provisions of this legislation prospectively immunize producers from enforcement actions brought under the Natural Gas Act based upon an extension of the principles of the Southland case, additional flexibility was needed respecting enforcement of past violations of requirements of the Natural Gas Act, for example in cases where the producer who had commenced deliveries of gas to interstate commerce diverted that gas to intrastate commerce. A Federal enforcement policy directed towards recovering a payback of natural gas volumes in conjectural circumstances (*especially where it is clear the producer*

*acted in good faith and without knowledge or notice that his gas might be regarded as dedicated due to the action of an earlier lessee under an expired lease) could frustrate the objectives of this bill. Producers faced with possible payback exposure would not be free to reinvest in new drilling activities the revenues derived from sales of historically intrastate gas. If this traditional financing mechanism is eliminated or seriously impaired, the supply objectives of this bill cannot hope to be achieved. Sudden supply disruptions in the intrastate market which could result from such an enforcement policy would also be inconsistent with the objectives of the legislation.* With respect to past violations of the Natural Gas Act, it is appropriate that enforcement be accomplished through development of judicious enforcement policies by the Federal Energy Regulatory Commission in consideration of the objectives of the Natural Gas Policy Act. . . . (emphasis supplied) (October 14, 1978, Cong.Rec., at H13115–H13116)

In the present case, this Court is dealing with just such a good-faith producer, the Allied Chemical Group, as that to which Congressman Dingell refers in his remarks.

■ As stated earlier, this Court found that under the Supreme Court's *Southland* decision, the Moffett Group, Mid-Continent, and Pennzoil had not committed acts of abandonment, and were not in violation of the Natural Gas Act. Thus, only the Wylie Heirs, Toce, and the Allied Chemical Group were potentially liable for payback damages for failing to get § 7(b) abandonment authority. However, with the enactment of the NGPA, and especially § 2(18)(B)(iii) thereof, even these three defendants are no longer subject to that liability, at least prospectively. The Court does not need, however, to decide whether exemption from payback liability operates from December 1, 1978, or from May 31, 1978, or any other date, for Congressman Dingell's comments make clear that the legislative intent is that *no* payback liability be imposed on these good-faith defendants.

In acting as they did, neither the Wylie Heirs, Toce, nor the Allied Chemical Group could have anticipated that the courts would one day regard the gas located below 10,600 feet subsea as dedicated to interstate commerce as a result of the actions of earlier lessees under terminated leases. To hold them responsible to Columbia Gas now, even for a limited payback of gas, would contravene both the spirit and the intent of the NGPA. Accordingly, the Court finds, that as a matter of law, the defendants are entitled to a judgment in their favor on Count I.

■ Furthermore, the Court does not find that any constructive fraud was perpetrated on Columbia Gas by Allied Chemical. Rather, Allied Chemical made a legal determination that the gas in those reserves below 10,600 feet subsea under Section 84 and Section 85 had been released from interstate dedication by the previous actions of predecessor lessees and the Wylie Heirs. Assuming that the reserves were no longer dedicated to interstate commerce, Allied Chemical felt no obligation to notify Columbia Gas of the transfer of the gas to the intrastate market. It is true that Allied Chemical attempted to take advantage of the release provisions in the Section 85 gas purchase contract as though it were a party to that contract, but this Court finds that such actions were intended as simply a safeguard in the event that Allied Chemical's legal calculations were wrong. Accordingly, the Court must deny Columbia Gas any relief sought under Count V.

Therefore, in accordance with this opinion, IT IS HEREBY ORDERED that judgment be entered as follows:

*Count I*: In favor of defendants James R. Moffett; the McWilliams Group; the Rankin Group; Mid-Continent Supply Company; Pennzoil Producing Company; the Wylie Heirs; W. L. Toce; Allied Chemical Corporation; Petrofunds, Inc.; Osais Biller; and Sunny South Oil & Gas, Inc., and against the plaintiff, Columbia Gas Transmission Corporation.

*Count V*: In favor of defendant, Allied Chemical Corporation, and against the

plaintiff, Columbia Gas Transmission Corporation.

IT IS FURTHER ORDERED that the indemnity claim of Pennzoil Producing Company against the Wylie Heirs and W. L. Toce, be and is hereby DISMISSED.

Written reasons for summary judgment on the motions of Mid-Continent Supply Company, Pennzoil and the Moffett Group will be issued contemporaneously with this opinion.