FALCON PETROLEUM, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 79–3648.

United States Court of Appeals,
Fifth Circuit.
Unit A

April 13, 1981.

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

HENDERSON, Circuit Judge:

Falcon Petroleum Company challenges an order of the Federal Energy Regulatory Commission (hereinafter "the FERC" or "the Commission"[1]) setting the price of natural gas from Falcon's well. The FERC correctly applied its regulations and the Natural Gas Policy Act of 1978 (hereinafter "the NGPA"). Hence, we affirm its decision and deny the petition for review.

Amoco Production Company and Gulf Oil Corporation held the oil, gas and mineral leases in a certain tract of land known as the Purdum unit, in Lipscomb County, Texas and dedicated the gas produced therefrom to interstate commerce. The unit was entered from a single well located on Amoco's half of the lease. Amoco ceased production and plugged the well in December, 1975. On August 16, 1976, Amoco filed a release of its working interest in the property and consequently, it reverted to the lessor/landowners. Amoco never sought permission from the Commission to abandon the well.

Falcon eventually leased the Purdum unit. After obtaining a permit from the Texas Railroad Commission, Falcon removed the twenty-foot cement plug Amoco had previously placed in the bottom of the well, and drilled an additional ten feet (*i. e.,* thirty feet of new drilling left the well ten feet deeper than when Amoco owned it). This drilling penetrated further into the Cleveland gas formation. Amoco had pierced the Cleveland formation, but never produced gas from it; all the gas Amoco retrieved came from the shallower Tonkawa formation. The ultimate issue before us is the proper price for gas from the Cleveland formation.

Falcon proposed to sell the Purdum gas, in intrastate commerce, to the City of Perryton, Texas. To that end, Falcon and the

---

Raymond D. Hurley, Washington, D. C., Connole & O'Connell, Washington, D. C., for petitioner Falcon Petroleum Co.

Jerome Nelson, Sol., George H. Williams, Jr., Washington, D. C., for respondent Federal Energy Regulatory Commission.

Patrick J. McCarthy, Law Dept., Omaha, Neb., for intervenors-respondents Northern Natural Gas Co.

---

1. The FERC assumed most of the duties of the Federal Power Commission on October 1, 1977. When used with reference to actions taken before that date, the term "Commission" refers to the Federal Power Commission.

city each requested the Commission to declare that Amoco had lawfully abandoned the well. The FERC consolidated the cases, denied declaratory relief and ordered that the petitions be treated as applications for abandonment authorization.

Falcon, the city and others subsequently proposed a settlement that would resume sales of gas to the interstate pipelines which had earlier purchased from Amoco. The settlement did not specify a price, but instead provided "that Northern and Transwestern [the pipelines] will pay, and Falcon will accept, whatever price the Commission determines that Falcon is entitled to under appropriate Commission rules, regulations and orders." Falcon is dissatisfied with the price established by the FERC when it approved the settlement.

Exploration and production costs are major factors in the Commission's rate calculations. Several years ago rising costs and high prices on the intrastate market resulted in shortages of gas for the interstate pipelines. In order to encourage new production, the Commission allows newer gas to sell at progressively higher rates. The price depends on the date drilling commences, the so-called "vintage date" of the well. The challenged order fixed the date Amoco commenced drilling as the vintage date. Falcon argues that the well should be vintaged with reference to the date of deeper drilling. We reject this contention.

On July 27, 1976, the Commission issued Opinion No. 770, setting national rates for certain natural gas sales. In response to staff questions, the Commission issued its Order Requiring New Producer Filings, FPC Docket No. RM75–14 (October 21, 1976). This order stated that

> Sales of natural gas from [a] completion operation into a different reservoir on or after January 1, 1973, in a well commenced prior to January 1, 1973, do[ ] not qualify for [the rate for new wells]. With respect to when a well is com-

menced, the date of commencement of the initial drilling or 'spudding' of a well is the controlling factor in determining whether sales from any producible reservoir qualify for the new rates.

Slip op. at 2. This rule was codified at 18 C.F.R. § 2.56a(a)(5)(iii).[2]

On November 5, 1976, the Commission issued Opinion No. 770–A, which quoted and reaffirmed Opinion No. 770 and the order of October 21, 1976. The Commission recognized, however, that deeper drilling into untested ground entailed risks similar to those attendant to new drilling, and, like new drilling, offered the possibility of new discoveries. Accordingly, the Commission established what Falcon calls "the deeper drilling exception."

> We hereby determine that the date of commencement of a well shall be, for vintaging purposes, determinative of the rate applicable to sales of natural gas from *all* formations to be produced from that well bore (other than formations later penetrated by deeper drilling) notwithstanding any contractual dedication limitations thereupon. This, however, shall be subject to a producer's entitlement to the Opinion No. 699–H rate for post-January 1, 1973 recompletions into different formations in a well commenced prior to January 1, 1973.
>
> Production from reservoirs penetrated for the first time through deeper drilling [205] in an existing well is eligible for the same rate as if the deeper drilling constituted the commencement of such well.
>
> 205. Deeper drilling is defined as drilling after the first completion and production in a well bore has been performed.

Slip op. at 161–62 (emphasis in original).

 The order and opinions quoted above establish that the vintage date for gas from a particular reservoir is to be determined by reference to the drilling that first entered the reservoir, without regard to the commencement of production. The

---

2. "(5) sales of natural gas ... may be made at a rate of $.52 per Mcf ... provided the sale is made pursuant to ... (iii) a completion operation into a different formerly nonproductive

reservoir commenced on or after January 1, 1973, in a well commenced (spudded) prior to January 1, 1973."

deeper drilling exception comes into play only when deeper drilling penetrates a previously untouched reservoir. The FERC concluded that gas from the Cleveland formation did not qualify for treatment as new gas because Amoco had already pierced the reservoir. It is clear that Opinion No. 770–A and the regulations contemplate that the Cleveland formation gas should carry the vintage of the Amoco drilling; Amoco, not Falcon, was the first to enter the reservoir. Moreover, this result is consistent with the Commission's enunciated rationale in the earlier cases.[3] This gas had already been discovered and made accessible, and neither fairness nor the public interest in providing incentives required the Commission to treat it as though it came from a new well. *See also Imperial Oil Co.*, Docket No. RI77–47 (April 18, 1977).

■ The petition was pending before the Commission when the NGPA was enacted, and the parties made supplemental arguments on the question of the proper price under that Act. The FERC correctly concluded that the gas was subject to the ceiling price established by NGPA § 104, 15 U.S.C.A. § 3314 (1980 Supp.), and the Commission's regulations, 18 C.F.R. § 271.-402(b)(4)(iv). Section 104 applies to "natural gas committed or dedicated to interstate commerce on November 8, 1978, and for which a just and reasonable rate under the Natural Gas Act was in effect on such date for the first sale of such natural gas ..."

Falcon insists that it is entitled to the ceiling price established by NGPA § 109(b), 15 U.S.C.A. § 3319(b) (1980 Supp.). Specifically, Falcon maintains that it qualifies under § 109(a)(2), 15 U.S.C.A. § 3319(a)(2) (1980 Supp.), which covers "natural gas committed or dedicated to interstate commerce on November 8, 1978, and for which a just and reasonable rate under the Natural Gas Act was not in effect on such date

for the first sale of such gas." Without explanation, Falcon argues that by virtue of the "Southland exclusion," NGPA § 2(18)(B)(iii), 15 U.S.C.A. § 3301(18)(B)(iii), its gas was not "committed or dedicated to interstate commerce." Falcon is wide of the mark, but in view of the confusion which has ensued, a brief analysis of the relevant sections of the Act is appropriate.

In *California v. Southland Royalty Co.*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978), the Supreme Court held that the owners of a reversionary interest in a gas well were bound by their lessee's earlier dedication of the gas to interstate commerce. In order to limit the effect of *Southland Royalty* on producers who could not have anticipated the Supreme Court's decision, *see* H.R.Rep.No.95–1752, at 71–72, *reprinted in* [1978] U.S.Code Cong. & Ad. News, 8983, 8987–88; *Columbia Gas Transmission Corp. v. Allied Chemical Corp.*, 470 F.Supp. 532, 548–51 (E.D.La.1979), the NGPA excludes certain gas from the category of that "committed or dedicated to interstate commerce" (thus "the Southland exclusion"). NGPA § 2(18)(B)(iii), 15 U.S. C.A. § 3301(18)(B)(iii) (1980 Supp.) provides that the term "committed or dedicated to interstate commerce"

does not apply with respect to—natural gas which, but for this clause would be committed or dedicated to interstate commerce under subparagraph (A)(ii) [*i. e.* gas which, if sold, would be required to be sold in interstate commerce (within the meaning of the Natural Gas Act) under the terms of any contract, any certificate under the Natural Gas Act, or any provision of such Act"] by reason of the action of any person ..., if on May 31, 1978—

(I) neither that person, nor any affiliate thereof, had any right to explore for, develope, produce, or sell such natural gas; and

---

3. We accord great weight to the Commission's construction of the statutes, *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 (1969); *Ecee, Inc. v. FERC*, 611 F.2d 554, 563 (5th Cir. 1980), and its own regulations, *Shell Oil Co. v. FPC*, 491 F.2d 82, 88 (5th Cir. 1974). The FERC

contends that Falcon is estopped from challenging the Commission-set price by its agreement to "accept [ ] whatever price the Commission determines that Falcon is entitled to ...." Since we find that the Commission's determination is consistent with the statutes and regulations, we need not decide this question.

(II) such natural gas was not being sold in interstate commerce ... for resale [and further exempting certain sales in interstate commerce].

█ A reversion occurred prior to May 31, 1978; no gas was being sold on that date; and Amoco, who had dedicated the gas, no longer had any interest in the well, so that it had no right to explore, develope produce or sell the gas on that date. The gas would thus qualify for the Southland exclusion in the hands of the reversioner and any subsequent grantee of the reversioner such as Falcon. H.R.Rep.No.1752, at 71, *reprinted in* [1978] U.S.Code Cong. & Ad.News at 8988; 124 Cong.Rec. H13116 (daily ed. Oct. 14, 1978) (statement of Rep. Dingell). The exclusion, however, protects only the reversioner and his subsequent grantees from the dedication of the predecessor in interest, and does not protect them from their own actions that commit or dedicate the gas to interstate commerce. Note, *The Meaning of the Southland Exclusion— Complexity and Ambiguity in the Natural Gas Policy Act*, 58 Tex.L.Rev. 435, 457 n.86 (1980).

█ Falcon therefore fails to qualify for the Southland exclusion with respect to that half of the Purdum well gas subject to the contract of March 17, 1978, with Transwestern. A contract to sell gas into interstate commerce is sufficient to commit gas within the meaning of the NGPA. NGPA § 2(18)(A)(ii), 15 U.S.C.A. § 3301(18)(A)(ii).[4] By virtue of the Transwestern contract, Falcon became a dedicator who, on May 31, 1978, had the right to explore, develop, produce, or sell the gas on that date. Thus, the Southland exclusion is inapplicable to that gas.

With respect to the other half of the Purdum well gas, Falcon's contract with Northern was not entered into until June 6, 1978. Therefore, on May 31, 1978, Falcon was still a subsequent grantee of the rever-

sioner, not a dedicator, and the gas therefore initially qualified for the Southland exclusion. However, entering into the contract to sell the gas into interstate commerce brought the gas back within the NGPA definition of committed or dedicated. Again, the exclusion does not protect the reversioner or his grantees from their own actions that commit or dedicate the gas to interstate commerce.

█ That all of Falcon's Purdum well gas is committed or dedicated within the meaning of the NGPA, however, does not resolve the pricing issue: both § 104 and § 109(a)(2) require that the gas be committed or dedicated within the meaning of the NGPA on November 8, 1978. Therefore, it is not enough to say that Falcon's gas was committed or dedicated within the meaning of the NGPA because of the Transwestern and Northern contracts. Pricing under § 104, rather than § 109(a)(2), additionally requires that on November 8th, the gas was subject to a Natural Gas Act ceiling price. Dedication under the Natural Gas Act requires not just a contract, but actual sales, unlike the NGPA's broader definition of committed or dedicated. *See Conoco, Inc. v. FERC*, 622 F.2d 796, 797 (5th Cir. 1980); *Cox v. FERC*, 581 F.2d 449, 450–51 (5th Cir. 1978). In this case, on November 8, 1978, Falcon's gas was not just committed or dedicated under the NGPA, but was also dedicated under the Natural Gas Act, and therefore subject to the applicable rates in Opinion No. 770 and its progeny. Two reasons support this conclusion.

█ The Southland exclusion is an exclusion from the NGPA definition of committed or dedicated, and has no operative effect itself. Note, *supra*, 456–58. If gas is dedicated under the Natural Gas Act, meeting the Southland exclusion tests on May 31, 1978, does not extinguish that dedication obligation. It is only when gas qualifies for the exclusion, and is not subsequently

---

4. That subsection provides "The term 'committed or dedicated to interstate commerce', when used with respect to natural gas, means—natural gas which, if sold, would be required to be sold in interstate commerce (within the mean-

ing of the Natural Gas Act) under the terms of any contract ...." The "if sold" language makes it clear that the gas was committed when Falcon entered into the contract, even if it had not then sold any gas.

brought back within the NGPA's definition on or before November 8th, that the gas is removed from Natural Gas Act jurisdiction on December 1, 1978, which then terminates the dedication obligation. NGPA § 601(a)(1)(A), 15 U.S.C.A. § 3431(a)(1)(A).

That the gas under the Northern contract initially qualified for the Southland exclusion thus did not affect the dedication obligation of that gas under the Natural Gas Act. As a result of Amoco's dedication and the lack of any abandonment authorization, that gas, and the gas under the Transwestern contract, at all relevant times remained dedicated under the Natural Gas Act. Even if the gas had not been originally dedicated under the Natural Gas Act, Falcon commenced deliveries under the two contracts on August 4, 1978. This served to dedicate the gas (again) to interstate commerce under the Natural Gas Act.

In conclusion, the gas from the Purdum well satisfies both of § 104's requirements for pricing thereunder. Accordingly, the Commission order correctly priced this gas under § 104 rather than under § 109 of the NGPA.

Petition for review DENIED.