652 F.2d 503
 61 A.L.R.Fed. 429
 COLUMBIA GAS TRANSMISSION CORPORATION, a corporation,
Plaintiff-Appellant,
v.
ALLIED CHEMICAL CORPORATION, a corporation, acting by and
through its "Union Texas Petroleum Division," et
al., Defendants-Appellees.
 No. 79-2416.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 4, 1981.
 
 Frank J. Peragine, James A. Burton, New Orleans, La., H. L. Snyder, Charleston, W. Va., for plaintiff-appellant.
 Gordon, Arata & McCollam, John M. McCollam, John A. Gordon, New Orleans, La., for W. O. Toce, et al.
 Deborah Bahan Price, Gene W. Lafitte, William R. Pitts, New Orleans, La., for Allied Chemical Corp., et al.
 Jones, Walker, Poitevent, Carriere & Denegre, John V. Baus, J. Mort Walker, Jr., and Edward B. Poitevent, II, New Orleans, La., for James R. Moffett.
 Landwehr & Foley, Dan A. Smertherman, New Orleans, La., for Mid-Continental Supply Co.
 Robert D. Nordhaus, Gen. Counsel, Jerome M. Feit, Deputy Sol., Joshua Z. Rokach, Atty., E. E. R. C., Washington, D. C., for amicus curiae E. E. R. C.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.
 SAM D. JOHNSON, Circuit Judge:
 
 
 1
 Columbia Gas Transmission Corporation sought injunctive relief and damages for alleged wrongful diversion of natural gas from reserves claimed to have been "dedicated" to its interstate pipeline system, by virtue of two gas purchase contracts between Columbia and certain predecessor producer-lessees, and by virtue of the commencement of deliveries of gas to Columbia pursuant to certificates of public convenience and necessity issued by the Federal Power Commission (FPC), now the Federal Energy Regulatory Commission (FERC), to the predecessor producer-lessees. Columbia appeals from the district court's entry of judgment in favor of all defendants. 470 F.Supp. 532 & 552 (E.D.La.1979). This Court affirms in part, reverses in part, and vacates and remands in part with instructions to the district court to refer a specified portion of this case to FERC.
 
 I. Facts
 
 2
 In the late 1940's and early 1950's, the Wylie Heirs, landowners in Louisiana, granted two oil and gas leases on two sections of land to two different producers. These producers entered into gas purchase contracts with United Fuel Gas Company, to whom Columbia has succeeded by merger. Shortly after the contracts were executed the FPC issued certificates of public convenience and necessity pursuant to section 7 of the Natural Gas Act of 1938 (NGA), 15 U.S.C.A. § 717f. These certificates authorized the respective lessee-producers under the two gas purchase contracts to sell and deliver gas in interstate commerce to United Fuel for resale. Neither the leases, the contracts, nor the certificates contained any limitation as to the depth of the dedicated reserves or the duration of the dedication.
 
 
 3
 The producer-lessees developed only those reserves above 10,600 feet subsea in depth. The Wylie Heirs wanted the producers to drill deeper, and in 1972 made formal demands on the producers for further development of the lease premises. After the producers failed to additionally develop the leaseholds, the Wylie Heirs made formal demand for the release of the undeveloped portions of those leases, in particular, all reserves below 10,600 feet subsea. When the requested releases were not forthcoming, the Wylie Heirs in 1973 filed suit in state district court to cancel the leases on the basis of nondevelopment.
 
 
 4
 The litigation was settled by a series of transactions that returned the undeveloped reserves below 10,600 feet to the Wylie Heirs. In 1973, James R. Moffett, the McWilliams Group, and the Rankin Group, together known as the Moffett Group, entered into negotiations with the then current producer-lessees with a view to acquiring the operating rights under the original leases. These negotiations were successfully completed, and the leasehold rights formally assigned to the Moffett Group. Soon after this assignment, the Moffett Group negotiated with the Wylie Heirs to compromise and settle the pending lawsuit. The settlement required that the Moffett Group release all rights to depths below the deepest sand then productive (10,600 feet subsea) and increase the Wylie Heirs' royalty interest from one-eighth ( 1/8) to one-sixth ( 1/6) on all new production above 10,600 feet subsea, with the royalty interest of one-eighth ( 1/8) to remain unchanged on production from previously drilled wells. In exchange for the Moffett Group's concessions, the Wylie Heirs agreed to dismiss the suit for cancellation and to deliver one new lease covering both sections as to depths above 10,600 feet subsea.
 
 
 5
 The Moffett Group had acquired only seven-eighths ( 7/8) of the working interest in the original two leases. Mid-Continent Supply Company owned the other one-eighth ( 1/8) of the working interest in the two sections as a nonoperator. Subsequent to the settlement between the Moffett Group and the Wylie Heirs, Mid-Continent agreed to settle the lease cancellation suit on the same basis as that agreed to by the Moffett Group. Pennzoil Producing Company owned an overriding royalty interest of 1/32 of 7/8 in the leasehold interest to one of the sections. Pennzoil agreed to release its interest in that original lease in exchange for the granting of an overriding royalty interest of 1/32 of 7/8 in a new lease to be granted by the Wylie Heirs covering both sections down to a depth of 10,600 feet.
 
 
 6
 In late 1973, pursuant to the settlement, the Moffett Group, Mid-Continent, and Pennzoil executed releases of their interests in the original two leases. The Wylie Heirs executed to defendant Toce, as leasing agent, a new "shallow gas" lease covering both sections and limited to depths above 10,600 feet. Toce then executed an assignment to Pennzoil of an overriding royalty interest of 1/32 of 7/8 in the new shallow gas lease, and executed an assignment of the new shallow gas lease to the Moffett Group and Mid-Continent.
 
 
 7
 The Wylie Heirs then executed to defendant Toce a new "deep gas" lease covering both sections and limited to the depths below 10,600 feet subsea. Toce then executed a sublease of the new deep gas lease to Allied Chemical Corporation, reserving to himself an overriding royalty interest of 3.91 percent. (Allied Chemical as early as 1972 had expressed to the Wylie Heirs an interest in acquiring a mineral lease in one or both of the two sections in the event the landowners were successful in obtaining the cancellation or release of the leases then covering those sections.) Allied Chemical executed an assignment of portions of the working interest in the new deep gas lease to Petrofunds, Inc., Osias Biller, and Sunny South Oil & Gas, Inc., which together with Allied Chemical constitute the Allied Chemical Group.
 
 
 8
 In early 1974, the Allied Chemical Group completed a new gas well on one of the sections at a depth below 10,600 feet, but denied any obligations to sell and deliver to Columbia any gas produced from both sections at depths below 10,600 feet subsea. In late 1974, Columbia formally demanded recognition of its right to purchase all gas produced from both sections, and this demand was rejected by the Allied Chemical Group as to gas produced from depths below 10,600 feet subsea. The Allied Chemical Group accordingly sold and delivered the deep gas to Sugar Bowl Gas Corporation in the intrastate market. The Allied Chemical Group did so without applying to the Commission for abandonment authorization with respect to any certificate obligation to sell the deep gas in interstate commerce.
 
 
 9
 Columbia then filed suit against all defendants other than the Wylie Heirs in October 1974, and the Wylie Heirs were given leave to intervene as parties defendant. Columbia originally alleged six separate causes of action in its complaint. The first was that all defendants had violated the NGA by diverting gas originally dedicated to interstate commerce without first obtaining the permission and approval of the FPC to allow it to abandon services and facilities previously dedicated. The second and third counts alleged breach of the gas purchase contracts by failure to give Columbia notice of the intention to surrender the leaseholds and failure to offer the working interest in those leaseholds to Columbia. The fourth and sixth counts sounded in tort, but Columbia amended its complaint to drop these counts. The fifth count was against Allied Chemical alone and also sounded in tort. Columbia stipulated that the fifth count stood or failed on the result of the first count.
 
 
 10
 The district court granted Pennzoil's motion for summary judgment, which Columbia did not oppose and does not appeal. Mid-Continent and the Moffett Group also moved for summary judgment, which was granted in favor of those defendants on the contract claims and from which Columbia does appeal. The case proceeded to trial on the alleged violation of the NGA. Subsequent to the trial, and after the parties post-trial memoranda had already been filed and the case taken under submission, the Supreme Court decided the case of California v. Southland Royalty Co., 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978) (4-3 decision). Shortly thereafter, Congress enacted the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C.A. §§ 3301-3432. Section 2(18)(B)(iii) of the NGPA, id. § 3301(18)(B)(iii), provides an exclusion from the definition of gas "committed or dedicated to interstate commerce." This exclusion limits the prospective application of the Southland decision without reversing it on its facts. Supplemental briefs were filed with regard to the Southland decision and the NGPA.
 
 
 11
 The district court concluded that Columbia was entitled to no recovery. It first found that the original gas purchase contracts, the leases, and the certificates covered all the reserves under the acreage in question. It also found that the certificates were of unlimited duration. These findings are not contested in this appeal. The district court, in reliance on the Southland decision, then held that the Allied Chemical Group could not divert the deep gas into intrastate commerce without authorization from the Commission for abandonment because the gas remained dedicated under the NGA. It also held that only the Wylie Heirs, Toce, and the Allied Chemical Group had participated in the intrastate diversion in violation of the NGA; the Moffett Group and Mid-Continent had only shifted control of dedicated facilities and were not required to seek abandonment authorization before releasing their interest in the deep gas. With respect to the Wylie Heirs, Toce, and the Allied Chemical Group, the district court found that, on the basis of the NGPA and its legislative history, those defendants should be exonerated from liability for the violations of the NGA.
 
 II. The Breach of Contract Claims
 
 12
 Both gas purchase contracts provide that the seller will not voluntarily surrender or permit to lapse any lease or other interest unless it gives the buyer a specified number of days' notice of its intention to surrender or permit the lease to lapse and offers to assign its interest to the buyer. The notice of surrender provisions, however, are qualified to provide that the seller is not liable for any "failure by reason of its inadvertence" to give this notice of surrender. Neither contract defines the term "inadvertence."
 
 
 13
 Both the Moffett Group and Mid-Continent failed to give Columbia notice of their intention to surrender to the Wylie Heirs their interest in the leaseholds on both sections. These defendants claim that they are exonerated from any liability, by reason of inadvertence in failing to notify Columbia, because they had not read and therefore were unaware of the notice of surrender provisions in the contracts. Columbia responds that the defendants' conduct does not come within the legal definition of inadvertence unless that conduct is excusable inadvertence, and not mere negligence. Columbia relies on Fed.R.Civ.Pro. 60(b)(1), which allows a party or his legal representative relief from a final judgment upon a showing of mistake, inadvertence, surprise, or excusable neglect; some courts construing this rule have held that while the word "excusable" does not directly modify "inadvertence," the inadvertence must nevertheless be excusable before relief will be granted. See, e. g., Ledwith v. Storkan, 2 F.R.D. 539, 544 (D.Neb.1942). See also Bershad v. McDonough, 469 F.2d 1333, 1337 (7th Cir. 1972) (neither ignorance nor carelessness is relievable as inadvertence).
 
 
 14
 The district court rejected Columbia's argument. "The proper analysis of the inadvertence issue does not begin by adopting a technical definition of inadvertence utilized by courts to narrow (relief under a procedural rule, but instead the court) must attempt to determine what the parties to the contract intended when they included the inadvertence clause." 470 F.Supp. at 554. Since the law to be applied in interpreting this contract is the law of Louisiana, the district court properly looked to La.Civ.Code Ann. art. 1946, which provides: "The words of a contract are to be understood, like those of a law, in a common and usual signification, without attending so much to grammatical rules, as to general and popular use." To decide the common and usual signification of the word "inadvertence," the district court turned to a dictionary definition: "not attentive or observant; negligent; heedless" and "due to oversight; unintentional." On this basis the district court concluded that conduct is inadvertently done if done unintentionally, though negligently; the inadvertence therefore need not be excusable. 470 F.Supp. at 554-55. "To judicially write 'excusable' into the contract would be to supply a qualifying word to a contract that the parties did not choose to add themselves." Id. at 555.
 
 
 15
 After finding that Columbia's predecessor in interest was the author of the two virtually identical gas purchase contracts at issue, the district court reasoned that
 
 
 16
 (h)ad United Fuel Gas Company desired to modify the term "inadvertence" by requiring that such inadvertence be found excusable, it was certainly free to do so or to attempt to do so in framing the contract language. Because of the absence of the qualifying word "excusable" this Court can only assume that the author decided against requiring a showing of excusable neglect, or, after attempting to add such language, the other parties rejected such attempt. When taking judicial notice of the fact that the natural gas market at the time that the contracts were entered was a buyer's market on no uncertain terms, this Court is satisfied in concluding that Columbia Gas' predecessor merely decided not to qualify "inadvertence."
 
 
 17
 Id. The district court then found that none of the defendants intentionally avoided giving notice to Columbia of their intended release of their interest in the leaseholds, though their failure to do so may have constituted negligence. The Moffett Group admitted that it had copies of both gas purchase contracts, but that it had looked at only three or four pages of each contract to determine the term of the contract, the date of termination, and the wellhead price. The district court concluded that, while the conduct of not reading the contracts in their entirety certainly was not prudent, failure to notify because of ignorance of the notice obligation was not intentional, and was therefore within the inadvertence exception to the notification provision. Id. Mid-Continent had a working interest in the leaseholds under the gas purchase contracts, but never served as an operator, and therefore never bothered to read these particular contracts. The district court held that the omission on the part of Mid-Continent was also unintentional and therefore within the scope of the inadvertence clause. Id. On the basis of holding that the failure to honor the notification clause arose from inadvertence, rather than intentional condcuct, the district court granted summary judgment in favor of Mid-Continent and the Moffett Group.
 
 
 18
 This Court and the parties in this litigation are unable to find any Louisiana case law involving an inadvertence provision such as this. Guided by the only Louisiana law available, the district court concluded that inadvertence included unintentional, though negligent, conduct. This conclusion was proper in light of the well-established principle that ambiguous phrases in contracts are to be construed against the party who prepared the contract. See, e. g., Kuhn v. Stan A. Plauche Real Estate Co., 249 La. 85, 185 So.2d 210, 213 (1966); Rayford v. Louisiana Savings Association, 380 So.2d 1232, 1238 (La.App.), writ denied, 384 So.2d 793 (La.1980); La.Civ.Code Ann. art. 1957 & 1958. Had the author intended the term "inadvertence" to carry some meaning other than its common and usual meaning, it should have provided its own definition in the contract, rather than leave interpretation of the term open to construction based on the dictionary definition. Finding no fault with the reasoning of the district court, and concluding that the district court's findings of fact are not clearly erroneous, this Court affirms the district court's grant of summary judgment on the breach of contract claims.[1]
 
 III. Violation of the NGA
 
 19
 The concept of dedication of gas production to interstate commerce is grounded in NGA § 7, which requires that natural gas companies obtain certificates of public convenience and necessity prior to commencing interstate deliveries of natural gas, and that Commission authorization is necessary before deliveries of gas can be abandoned. Obtaining a certificate of public convenience and necessity, however, did not alone constitute dedication. Gas reserves under the certificate became dedicated to interstate commerce when physical delivery of gas commenced pursuant to the certificate. Tenneco Exploration, Ltd. v. FERC, 649 F.2d 376, 379-80 (5th Cir. 1981); Falcon Petroleum v. FERC, 642 F.2d 780, 784 (5th Cir. 1981); Conoco, Inc. v. FERC, 622 F.2d 796, 797 (5th Cir. 1980); Wessely Energy Corp. v. Arkansas Louisiana Gas Co., 593 F.2d 917, 920 (10th Cir. 1979) (per curiam).
 
 
 20
 One of the most controversial decisions concerning the scope of the dedication obligation is California v. Southland Royalty Co., 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978) (4-3 decision). In that case, a producer acquired a fifty-year oil and gas lease, entered into a gas purchase contract with an interstate pipeline, obtained a certificate from the FPC, and initiated deliveries of gas. When the lease expired, the producer-lessee's interest in the remaining reserves reverted to the owners of the reversionary mineral interest. The reversioner contracted to sell its share of production to an intrastate pipeline, but the FPC held that the previous interstate sales dedicated all the gas covered by the original lease, including the gas remaining at the termination of the lease, and therefore the gas could not be diverted to the intrastate market without Commission abandonment authorization. On appeal, the Fifth Circuit held that under Texas property law the producer-lessee could not dedicate the portion that the reversioners would own upon termination of the lease. Southland Royalty Co. v. FPC, 543 F.2d 1134 (5th Cir. 1976). The Supreme Court reversed. It held that the earlier dedication covered all the natural gas reserves beneath the tract, and that diversion of the gas had to be authorized by the Commission. The majority relied on two alternative rationales to hold that the reversioners' interest remained dedicated. 436 U.S. at 525-31, 98 S.Ct. at 1958-61. The first rationale is the successor in interest doctrine: if a lessee initiated an interstate sale pursuant to a certificate, all subsequent owners of the mineral rights, including leasehold reversioners, are bound by the dedication obligation of the original lessee as successors in interest to the working interest of the dedicating lessee. Alternatively, because the gas continued to flow in interstate commerce at the termination of the lease, that flow constituted a service that the reversioner can withdraw only with Commission approval.
 
 
 21
 The Southland decision was handed down while this case was still under submission in the district court. Consequently, the outcome of this case changed as the complexion of the law changed. After digesting the Southland decision, and on the basis of that case, the district court concluded that the deep gas was subject to the original dedication obligation.[2] The court then determined which of the defendants had actually abandoned the interstate service without Commission authorization. It is only this latter portion of the determination that the NGA was violated that is challenged in this appeal.
 
 
 22
 The district court held that the Moffett Group and Mid-Continent were not required to seek FPC approval prior to release of the leaseholds and thus were not in violation of the NGA. The court, in reliance on language in the Southland decision, distinguished between conduct constituting an abandonment and conduct that would only shift responsibility for carrying out services dedicated to interstate commerce.[3] The district court accordingly concluded that by their contractual arrangements the Moffett Group and Mid-Continent only shifted control of dedicated facilities, and thereby the obligation to continue the dedicated service, to the Wylie Heirs. The district court further found that because the Moffett Group and Mid-Continent released their interest in the deep gas in an effort to compromise the lease cancellation suit, their sole interest in making the release was to protect their leasehold interest in the reserves above 10,600 feet subsea and not to divert the dedicated reserves to intrastate commerce. 470 F.Supp. at 547.
 
 
 23
 FERC, which participated in this appeal as amicus curiae, joins with Columbia to argue that it is improper to draw a distinction between shifting control of service, by a contractual conveyance of the pre-existing obligation to sell gas in interstate commerce, and abandonment of service. The Commission first argues that the Moffett Group and Mid-Continent could not limit the dedication obligation to gas only above 10,600 feet without applying for partial abandonment or a change in the certificate since the certificate was without any limitation on depth or duration. That argument misses the point, however, since the obligation is not limited but instead continues, and is merely shifted to another party to bear.
 
 
 24
 The Commission also argues that the surrender of the lower depths withdrew a portion of the dedicated area from the certificate without Commission approval. Again, the surrender did not withdraw the gas from the dedication obligation, but merely shifted the obligation to another party. Abandonment within the meaning of NGA § 7 is an act that permanently reduces a significant portion of a particular service dedicated to interstate markets. Reynolds Metal Co. v. FPC, 534 F.2d 379, 384 (D.C.Cir.1976). As long as the surrender by the Moffett Group and Mid-Continent was not taken for the purpose of terminating the service obligation without the Commission's approval, their surrender did not permanently reduce a significant portion of service. This Court concludes that the district court's findings that there was no understanding on the part of the Moffett Group and Mid-Continent that the release of their leasehold interests was for the purpose of terminating the service obligation, and that the surrender was undertaken solely to compromise the lease cancellation suit, are not clearly erroneous.[4] The surrender was therefore not an act of abandonment, even though it may have been a necessary step before the Wylie Heirs, Toce, and the Allied Chemical Group could effectuate an abandonment, but instead simply shifted responsibility for honoring the dedication obligation to those who later did fail in that obligation.
 
 
 25
 Columbia and FERC also point to 18 C.F.R. § 2.64(a), which deals with transfers of certificated acreage by independent producers. This regulation provides:
 
 
 26
 A natural gas producer who transfers all or part of his producing acreage to another does not have to apply for an amendment to his existing certificate of public convenience and necessity authorizing the sale if the new producer is required to obtain a certificate to sell gas from the property, i. e., in those cases where gas is being produced from the assigned acreage or, if the acreage is nonproductive at the time of transfer if the assignee initiates a sale for resale in interstate commerce. In those cases where the assigned acreage is not productive at the time of transfer, the assignor must obtain Commission authorization to delete such acreage, either pursuant to an application to amend his existing certificate to delete the assigned acreage or by filing an application under section 7(b) of the Natural Gas Act to abandon service from the acreage, unless, within one year from the date of the assignment the successor in interest files an application for certificate authorization to sell the gas for resale in interstate commerce.
 
 
 27
 The Commission contends that, while the regulation is drafted in terms of assignment rather than surrender of a lease, it nonetheless applies to this case because, it argues, the surrender of a leasehold is the equivalent of an assignment of the leasehold. Section 2.64(a) is under this view applicable and was accordingly violated since the Moffett Group and Mid-Continent did not seek Commission approval for the change resulting from the surrender and the Allied Chemical Group never filed for a certificate within one year from the surrender. We are unpersuaded, however.
 
 
 28
 Section 2.64(a) deals with "farmouts," that is, when a lessee who does not desire to drill assigns the working interest, or some portion thereof, to another operator who finds commercial quantities of oil or gas.[5] Therefore, the regulation expressly deals only with assignments, as its language provides, and not with surrenders of a leasehold interest. Because an assignment and a surrender both cause a transfer of a leasehold interest, the Commission argues that the surrender is not legally different from an assignment and should be within the regulation's scope, in reliance on Southland. The Southland decision held that reversioners succeed to the original lessee's service obligation as successors in interest, the same as any assignee of the original lessee. That a reversioner is within the successor in interest doctrine does not answer the question here, however. The issue is not whether the gas remains dedicated in the hands of the successor in interest, for clearly it does, but instead, whether the event by which the gas, with its dedication obligation, is placed in the hands of the successor in interest is an act of abandonment. The passing of the contractual right of control of dedicated service and facilities itself does not constitute an abandonment, since by itself it does not permanently reduce a significant portion of the dedicated service. While knowing participation in a scheme to divert dedicated gas that involves the shifting of control over such service can be an act of abandonment, the district court found that the Moffett Group and Mid-Continent did not knowingly so participate.[6]
 
 
 29
 This Court concludes that the district court properly found that the Moffett Group and Mid-Continent did not violate the NGA by the surrender of their leases. The next question is whether the district court properly held that the Wylie Heirs, Toce, and the Allied Chemical Group violated the NGA by diverting the dedicated gas into the intrastate market without prior Commission authorization of abandonment.
 
 
 30
 The district court held that the actions of the Wylie Heirs, Toce, and the Allied Chemical Group were taken with the clear intention to place the reserves below 10,600 feet subsea into the intrastate market. The effect of their acts was to terminate the service obligation without the Commission's permission. The Allied Chemical Group does not contest the district court's initial finding that they violated the Natural Gas Act when they made the actual diversion of deep gas to the intrastate market. This Court accordingly affirms the district court's finding that the Allied Chemical Group violated the NGA.
 
 
 31
 With regard to the Wylie Heirs and Toce, they participated in the transfer of the interests in the deep gas to Allied Chemical. Similar to the surrender of the leasehold interest by the Moffett Group and Mid-Continent to the Wylie Heirs, the grant of a new leasehold interest to Allied Chemical also shifted control of dedicated facilities, and thus the obligation to continue interstate service, to Allied Chemical. But the district court found that the grant of a new leasehold interest in the deep gas to Allied Chemical was made with full knowledge and intention that the gas would be sold in intrastate commerce. Therefore, the Wylie Heirs and Toce knowingly participated in the abandonment. The Wylie Heirs and Toce do not cross appeal on this finding of fact, and only argue that the Southland decision should be limited to its facts. Accordingly, this Court deems that they have waived any objection to being included with the Allied Chemical Group in the district court's finding that they participated in the diversion of gas.
 
 
 32
 The Wylie Heirs and Toce argue that the Southland decision should be limited to its facts, and thus argue that they did not wrongfully divert the gas from interstate commerce in violation of the NGA since the gas was not dedicated. More specifically, they argue that the Southland decision should be limited to the alternative flowing gas rationale of the Court's opinion. This Court rejects such an attempt to limit the Southland decision. In United Gas Pipe Line Co. v. McCombs, 442 U.S. 529, 99 S.Ct. 2461, 61 L.Ed.2d 54 (1979), the Court held that the requirement to sell dedicated gas into interstate commerce continued even after the interstate pipeline had abandoned its facilities for receipt of the gas and even though the well at issue had not produced for several years. Therefore, the Supreme Court has indicated that it will not limit the Southland decision to the flowing gas rationale. This Court has also indicated that it will not limit the Southland decision. See Texas Oil & Gas Corp. v. Valley Gas Transmission, Inc., 608 F.2d 231 (5th Cir. 1979).
 
 
 33
 The Wylie Heirs and Toce also argue, relying on the so-called "Southland exclusion" in NGPA § 2(18)(B)(iii), that the NGPA authorizes further judicial limitations on the Southland decision. Although the Southland exclusion does modify the continued application of the Southland decision, it also has the effect of making the Southland decision, as modified, "a permanent part of the natural gas regulatory landscape." Note, The Meaning of the Southland Exclusion Complexity and Ambiguity in the Natural Gas Policy Act, 58 Texas L.Rev. 435, 459, 461 (1980). This Court is not willing to go beyond the limitations on the Southland decision already placed on it by Congress. This brings us to the next major issue in this case: the effect and impact of the NGPA's Southland exclusion on the liability of the Wylie Heirs, Toce, and the Allied Chemical Group for having violated the NGA.
 
 IV. The Southland Exclusion of the NGPA
 
 34
 NGPA § 2(18)(A)(ii) provides that the term "committed or dedicated to interstate commerce" means "natural gas which, if sold, would be required to be sold in interstate commerce (within the meaning of the Natural Gas Act) under the terms of any contract, any certificate under the Natural Gas Act, or any provision of such Act." Since the deep gas remained dedicated under the NGA, it is within the NGPA definition of "committed or dedicated," unless it qualifies for exclusion from the NGPA definition. Section 2(18)(B)(iii), also known as the "Southland exclusion," provides that the term "committed or dedicated to interstate commerce" does not apply with respect to
 
 
 35
 natural gas which, but for this clause, would be committed or dedicated to interstate commerce under subparagraph (A)(ii) by reason of the action of any person (including any successor in interest thereof, other than by means of any reversion of a leasehold interest), if on May 31, 1978
 
 
 36
 (I) neither that person, nor any affiliate thereof, had any right to explore for, develop, produce, or sell such natural gas; and
 
 
 37
 (II) such natural gas was not being sold in interstate commerce (within the meaning of the Natural Gas Act) for resale (other than (certain specified sales not relevant here)).
 
 
 38
 The keying date for application of the Southland exclusion May 31, 1978 is the date the Supreme Court handed down its Southland decision; the successor in interest and flowing gas rationales of the Court are also reflected in the Southland exclusion. Note, The Meaning of the Southland Exclusion at 444. The exclusion thus limits the application of the Southland decision without reversing it on its facts. See H.R.Rep.No. 1752, 95th Cong., 2d Sess. 71 (1978), U.S.Code Cong. & Admin.News 1978, p. 8800.
 
 
 39
 The district court applied the Southland exclusion and found that the deep gas met the tests necessary to qualify for that exclusion from the NGPA definition of "committed or dedicated." 470 F.Supp. at 548-50. The voluntary surrender of the original leases occurred in 1973. On the assumption that the voluntary surrender constituted a reversion, the Southland exclusion's requirement that a reversion occur prior to May 31, 1978, was met. On May 31, 1978, the subsequent grantee (Allied Chemical) of the reversioners (the Wylie Heirs) held the right to produce, explore, develop, and sell the deep gas. Therefore, as required by the Southland exclusion, neither the dedicator, the dedicator's affiliates, nor the successors in interest of the dedicator prior to the reversion, had those rights on May 31, 1978.[7] Finally, since the deep gas was being sold in intrastate commerce, the deep gas was not flowing in interstate commerce on May 31, 1978, as further required by the Southland exclusion.[8] Columbia, however, contests some crucial express assumptions made by the district court in arriving at its conclusion.
 
 
 40
 Columbia first challenges the assumption that the voluntary surrender of the original leases constituted a "reversion" within the meaning of the Southland exclusion. The NGPA does not define the term "reversion." However, Representative Dingell, in a statement in the Congressional Record, explained that a "reversion" is
 
 
 41
 any process by which a natural gas leasehold interest or part thereof terminates and the lessee loses the right to explore for, develop, produce, or sell natural gas from the acreage formerly covered by such lease or part thereof. Such processes include termination by voluntary release, by judicial cancellation decree, or under the provisions of a lease which require termination if production is not established or if production is not maintained in paying quantities.
 
 
 42
 124 Cong.Rec. H13116 (daily ed. Oct. 14, 1978) (emphasis added). In reliance on Representative Dingell's statement, the district court correctly held that the voluntary surrender in settlement of litigation constituted a "reversion." In addition to Representative Dingell's statement, the Conference Committee Report to the NGPA states that the term "successor in interest" in the Southland exclusion does not include "any interest owner who acquires his right pursuant to the reversion or any other termination of a natural gas leasehold interest." H.R.Rep.No. 1752, supra, at 71, U.S.Code Cong. & Admin.News 1978, p. 8988 (emphasis added). A statutory provision must be read in light of the central purpose of the statute, as derived from its legislative history and the circumstances surrounding its enactment. Johansen v. United States, 343 U.S. 427, 431, 72 S.Ct. 849, 852, 96 L.Ed. 1051 (1952); Note, Legislative History of the Natural Gas Policy Act: Title I, 59 Texas L.Rev. 101 (1980). This Court is compelled to conclude, in light of the foregoing legislative history and the exclusion's remedial purpose in limiting the Southland decision, that the term "reversion" should be broadly construed to encompass various forms of relinquishing a leasehold interest, including voluntary surrender. See Note, The Meaning of the Southland Exclusion at 453-54. We affirm the district court's holding in this regard.
 
 
 43
 The district court also held the Southland exclusion encompasses partial reversions of a leasehold.[9] Again, the NGPA does not define "reversion," but does refer to a reversion of a "leasehold interest " rather than simply "a leasehold," which implies that the exclusion may encompass reversions of part of a leasehold estate. The Conference Committee Report to the NGPA, which states that the term "successor in interest" does not include "any interest owner who acquires his right pursuant to the reversion or any other termination of a natural gas leasehold interest," H.R.Rep.No. 1752, supra, at 71, U.S.Code Cong. & Admin.News 1978, p. 8988 (emphasis added), similarly implies a partial reversion. Most persuasive, however, is Representative Dingell's statement that the term "reversion," was intended to include "any process by which a natural gas leasehold interest or part thereof terminates and the lessee loses the right to explore for, develop, produce, or sell natural gas from the acreage formerly covered by the lease or part thereof." 124 Cong.Rec. at H13116 (emphasis added). Therefore, this court, in light of the foregoing legislative history and the remedial purpose of the Southland exclusion, affirms the district court's holding that the term "reversion" in the Southland exclusion can encompass partial leasehold reversions. See Note, The Meaning of the Southland Exclusion at 453-54 (statutory purpose frustrated if protection of reversioners from application of successor in interest doctrine is limited to cases in which entire leasehold reverts).
 
 
 44
 Columbia also argued that the two different levels of gas reserves could not be separated from each other, and since the gas above 10,600 feet was flowing in interstate commerce on May 31, 1978, the requirement of the exclusion in this regard was not met. The district court rejected this argument because "a partial release of gas rights is authorized, and it is the released gas which must be flowing on May 31, 1978, to defeat exclusion." 470 F.Supp. at 550 (emphasis in original). This Court finds this reasoning accurate and precise as a matter of statutory interpretation. Since the statute authorizes partial reversions, then it does not matter that the partial reversion of the leasehold is defined according to depth rather than specified surface acreage.[10] See Note, The Meaning of the Southland Exclusion at 453-54. Since the statute provides that the gas covered by the reversion must not be flowing in interstate commerce on May 31, 1978, the deep gas properly qualifies for the Southland exclusion even though the shallow gas was flowing in interstate commerce on that date.[11]
 
 
 45
 In summary then, this Court holds that the district court correctly held that the deep gas qualified for the Southland exclusion. The next step in the analysis is to determine what consequences flow from having so qualified.
 
 
 46
 Columbia argued that even if the deep gas does qualify for the Southland exclusion, under the Southland decision it is entitled to receive a payback of all gas wrongfully diverted up until December 1, 1978, because that date is when the protection of the exclusion becomes effective. Columbia pointed to NGPA § 601(a)(1)(A), 15 U.S.C.A. § 3431(a)(1)(A), which provides:
 
 
 47
 For purposes of section 1(b) of the Natural Gas Act, effective on (December 1, 1978), the provisions of the Natural Gas Act and the jurisdiction of the Commission under such Act shall not apply to natural gas which was not committed or dedicated to interstate commerce as of November 8, 1978, solely by reason of any first sale of such natural gas.
 
 
 48
 The district court rejected this argument on two grounds. The reasoning of the district court in this regard, however, is in error, and we accordingly reverse the district court's conclusion on the first ground and vacate it on the second.
 
 
 49
 The first ground that the district court acted upon concerned the point in time at which the Southland exclusion is effective. The district court held that gas meeting the necessary qualifications of the Southland exclusion on May 31, 1978, is considered not "committed or dedicated" as of that date, and hence is not committed or dedicated prior to the enactment of the NGPA. It then concluded that there is no Commission jurisdiction under NGA § 1(b) over such gas, and hence, no wrongful diversion without NGA § 7 abandonment authority.
 
 
 50
 The district court then addressed what it termed as "technical violations" occurring prior to May 31, 1978, and found, on the basis of the legislative history, that there is no payback requirement for prior Southland -type violations either. Representative Dingell in his explanatory statement remarked:
 
 
 51
 While the Southland provisions of this legislation prospectively immunize producers from enforcement actions brought under the Natural Gas Act based upon an extension of the principles of the Southland case, additional flexibility was needed respecting enforcement of past violations of requirements of the Natural Gas Act, for example in cases where the producer who had commenced deliveries of gas to interstate commerce diverted that gas to intrastate commerce. A Federal enforcement policy directed towards recovering a payback of natural gas volumes in conjectural circumstances (especially where it is clear the producer acted in good faith and without knowledge or notice that his gas might be regarded as dedicated due to the action of an earlier lessee under an expired lease) could frustrate the objectives of this bill. Producers faced with possible payback exposure would not be free to reinvest in new drilling activities the revenues derived from sales of historically intrastate gas. If this traditional financing mechanism is eliminated or seriously impaired, the supply objectives of this bill cannot hope to be achieved. Sudden supply disruptions in the intrastate market which could result from such an enforcement policy would also be inconsistent with the objectives of the legislation. With respect to past violations of the Natural Gas Act, it is appropriate that enforcement be accomplished through development of judicious enforcement policies by the Federal Energy Regulatory Commission in consideration of the objectives of the Natural Gas Policy Act.
 
 
 52
 124 Cong.Rec. H13115-H13116 (daily ed. Oct. 14, 1978). The district court concluded that the Wylie Heirs, Toce, and the Allied Chemical Group could not have anticipated that the courts would one day regard the gas located below 10,600 feet subsea as dedicated to interstate commerce as a result of the actions of earlier lessees under terminated leases. Concluding that the ordering of even a limited payback of gas would contravene the spirit and intent of the NGPA, the district court held that these defendants were entitled to judgment in their favor on the first count of Columbia's complaint. Because the district court in reliance on Representative Dingell's statement held that no payback liability would be imposed on the "good faith defendants," the court retreated from its earlier conclusion concerning when the Southland exclusion became effective. It stated that it did not need to decide whether exemption from payback liability operates from December 1, 1978, or from May 31, 1978, or any other date, in light of Representative Dingell's explanatory statement.
 
 
 53
 With regard to the district court's initial view that the Southland exclusion is effective on May 31, 1978, this Court has previously stated that gas qualifying for the Southland exclusion is removed from NGA jurisdiction on December 1, 1978, by NGPA § 601(a)(1)(a). Columbia Gas Development Corp. v. FERC, 651 F.2d 1146, 1157 n.14 (5th Cir. 1981); Falcon Petroleum v. FERC, 642 F.2d 780, 784-85 (5th Cir. 1981). The district court's interpretation suffers from the assumption that section 2(18)(B)(iii) is an exclusion from NGA dedication, with the only question being one of effective date. The exclusion, however, is an exclusion from the NGPA's definition of "committed or dedicated" for purposes of applying the operative NGPA provisions, one of which, in addition to wellhead pricing and price deregulation, is selective repeal of NGA jurisdiction (and thus dedication requirements) by NGPA § 601(a)(1).[12] Note, The Meaning of the Southland Exclusion at 456. The May 31, 1978, keying date is merely a condition to qualifying for the definitional exclusion. Id. The gas interest of a reversioner or subsequent grantee of a reversioner that qualifies under the Southland exclusion remains dedicated under the NGA until removed from NGA jurisdiction on December 1, 1978, because the exclusion deems that gas to be not "committed or dedicated" on November 8, 1978, for purposes of applying NGPA § 601 (a)(1)(a). See Falcon, 642 F.2d at 784-85. The reversioner or his subsequent grantee would, however, remain in violation of the NGA for any unauthorized Southland -type diversions or abandonments of gas prior to December 1, 1978. Note, The Meaning of the Southland Exlcusion at 456. Therefore, since FERC still has NGA jurisdiction until December 1, 1978, over gas that qualifies for exclusion from the NGPA definition of "committed or dedicated," it still possesses enforcement authority for violations of the NGA with respect to that gas that occurred prior to December 1, 1978.
 
 
 54
 Accordingly, this Court holds that the Wylie Heirs, Toce, and the Allied Chemical Group have violated the Natural Gas Act for wrongful diversions prior to December 1, 1978. Sales of the deep gas into the intrastate market on or after December 1, 1978, are no longer in violation of the NGA pursuant to NGPA § 601(a)(1)(A). This brings us to the final issue of whether Columbia is entitled to a payback of the gas wrongfully diverted prior to December 1, 1978.
 
 
 55
 The question is whether, as a matter of discretion, enforcement of a payback obligation should be ordered, a decision reviewable under the abuse of discretion standard. Such an exercise of discretion is to be undertaken with Representative Dingell's caution in mind concerning FERC enforcement policy with respect to Southland -type diversions. Because the district court essentially concluded that all prior Southland -type violations are within Representative Dingell's caution, this Court vacates the district court's holding that Representative Dingell's statement exonerated the defendants from liability.
 
 
 56
 Representative Dingell expressed the view that FERC should pursue a judicious course in enforcing the statute: zealous enforcement with regard to past diversions, when the producer acted in good faith and without knowledge or notice that his gas might be regarded as dedicated due to the action of an earlier lessee under an expired lease, might frustrate the goals of the NGPA by impairing the ability of producers to finance new exploration and development from the revenue generated by intrastate gas sales. One situation most clearly within Representative Dingell's statement is when a producer walked away from a lease because production was no longer commercially feasible, but failed to apply for or receive an abandonment authorization for the gas that he had earlier dedicated. The landowner to whom the lease reverted may very well not have known that the gas was dedicated to interstate commerce, and almost certainly would not know that an abandonment authorization had not been granted. The landowner may not even have known of the necessity for an abandonment authorization. Certificates and abandonment authorizations are not typically recorded in title records. Note, The Meaning of the Southland Exclusion at 443 n.42. Years later, a prospective lessee who determines that it is now commercially feasible to attempt production would thus have no easy means by which to ascertain whether there was an earlier dedication and, if so, whether an abandonment authorization with respect to this acreage had been applied for or granted. The new lessee would sell the gas in the best market at the time most likely the intrastate market.
 
 
 57
 This hypothetical situation is clearly not the case here. The deep gas was diverted in 1974, and prior to that time Columbia indicated to the Allied Chemical Group and the Wylie Heirs that it considered the deep gas to be dedicated to Columbia. The Wylie Heirs participated in the creation of the reversion of the leasehold to them since the reversion was accomplished by voluntary surrender in settlement of litigation. Therefore, the Wylie Heirs knew that all reserves, including the deep gas, might be within the original dedication. The Allied Chemical Group was similarly aware that the deep gas might be within the original dedication since it was aware of the circumstances under which the reversion of the leasehold interest in the deep gas occurred.[13]
 
 
 58
 Rather than determine whether or not the case at hand is also within Representative Dingell's enforcement caution, however, this Court will instead vacate the judgment of the district court and instruct it on remand to refer the question of enforcement for the diversions prior to December 1, 1978, to FERC under the doctrine of primary jurisdiction.[14] Exoneration from liability in whole or in part is properly a matter for FERC discretion and expertise.[15] That determination will be subject to the abuse of discretion standard, in light of Representative Dingell's caution to FERC about judicious enforcement and NGPA policy goal achievement.[16]
 
 IV. Conclusion
 
 59
 This Court affirms the judgment of the district court with respect to the breach of contract claims. We also uphold the district court's conclusion that the Moffett Group and Mid-Continent did not violate the NGA, and that the Wylie Heirs, Toce, and the Allied Chemical Group did violate the NGA through the wrongful diversion of dedicated gas. This Court further upholds the district court's conclusion that the deep gas qualified for the Southland exclusion, NGPA § 2(18)(B)(iii). This Court vacates the district court's conclusion that, while the Wylie Heirs, Toce, and the Allied Chemical Group violated the NGA, they are exonerated from liability for that violation because of Representative Dingell's statement regarding enforcement for past Southland -type violations. We hold that qualifying for the Southland exclusion removes the gas from NGA jurisdiction on December 1, 1978, and therefore the NGA is violated with respect to diversions prior to that date. This Court vacates the district court judgment with regard to the payback obligation issue, and remands the case to the district court with instructions to refer to the Commission the determination of whether a payback obligation should be imposed on the Wylie Heirs, Toce, and the Allied Chemical Group.
 
 
 60
 AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 [1]
 Columbia additionally argues on appeal that the Moffett Group and Mid-Continent are presumed to have read and understood the contents of the contracts. See, e. g., Hicks v. Ocean Drilling & Exploration Co., 512 F.2d 817, 825-26 (5th Cir. 1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976), quoting St. Landry Loan Co. v. Avie, 147 So.2d 725, 727 (La.App.1962); LeNy v. Friedman, 372 So.2d 721, 723 (La.App.), writ denied, 375 So.2d 943 (La.1979). The presumption that the Moffett Group and Mid-Continent were aware of the notice of surrender provisions is of no aid to Columbia in this case. This presumption goes to the validity of the contract. See Hicks, 512 F.2d at 825; St. Landry, 147 So.2d at 727. Even if this presumption were relevant here, the express inadvertence exception controls over the presumption of law
 
 
 [2]
 More specifically, the district court determined that the sellers and buyer under the gas purchase contracts intended to dedicate all reserves underlying both sections, whether developed or not, and that the FPC certificate was of unlimited duration with regard to the dedication of those reserves. 470 F.Supp. at 542-44. It then held that the original lessees had the power to place all reserves underlying the leaseholds within the jurisdiction of the Commission, even though the lessees may not have technically owned such reserves, because, as taught by the Southland decision, the concept of dedication describes a regulatory status and not a transfer of the gas. 470 F.Supp. at 544. The district court next rejected, in reliance on Mitchell Energy Corp. v. FPC, 533 F.2d 258 (5th Cir. 1976), the argument that the reserves fell within the "production or gathering of natural gas" exemption in NGA § 1(b), 15 U.S.C.A. § 717(b). 470 F.Supp. at 544-45. The district court additionally rejected, also in reliance on Southland, the argument that the seller-lessee under a gas purchase contract cannot dedicate a greater right to the leasehold gas than the lessee itself has under its lease agreement with the landowners, so that the dedication to interstate commerce was alleged to terminate at the same time that the seller-lessee's rights under the lease agreement ended. 470 F.Supp. at 546-47. Similarly, the district court rejected the Wylie Heirs' argument that they should not be viewed as natural gas companies, again in reliance on the Southland decision; the dedication is not the dedication of an individual party or producer, but the dedication of gas. Id. at 547
 
 
 [3]
 470 F.Supp. at 547. The language in Southland relied on by the district court is that "(p)rivate contractual arrangements might shift control of the facilities and thereby determine who is obligated to provide that service, but the parties may not simply agree to terminate the service obligation without the Commission's permission." 436 U.S. at 527, 98 S.Ct. at 1959 (emphasis in original)
 
 
 [4]
 Indeed, Columbia amended its complaint to drop counts four and six, which alleged an "overall scheme" on the part of all defendants to divert gas from Columbia
 
 
 [5]
 H. Williams & C. Meyers, Oil and Gas Terms 211 (4th ed. 1976)
 
 
 [6]
 This particular issue whether shifting control of dedicated service is an act of abandonment was not directly addressed by the Supreme Court in Southland. FERC, in an attempt to support its argument that a surrender of a leasehold requires prior Commission approval, points to the orders reviewed in Southland as requiring approval prior to the lease reversion there. This reliance is misplaced, however. The Supreme Court only noted, in its statement of the case, that FERC also ordered the dedicator-lessee to seek abandonment permission. 436 U.S. at 522-23, 98 S.Ct. at 1957. The Supreme Court did not pass on that holding in its reasoning, nor did the Fifth Circuit discuss that portion of the Commission's order when it reversed the Commission. In the face of this silence, this Court views the Supreme Court's language suggesting a distinction between abandonment and the shifting of control over dedicated service as controlling
 
 
 [7]
 The term "that person" in subclause I refers to the dedicator and his successors in interest prior to the reversion, but not the reversioner or his successors in interest, that is, his subsequent grantees. See Falcon Petroleum v. FERC, 642 F.2d 780, 784 (5th Cir. 1981); H.R.Rep.No. 1752, supra, at 71; 124 Cong.Rec. H13116 (daily ed. Oct. 14, 1978) (statement of Rep. Dingell); Note, The Meaning of the Southland Exclusion at 445-49. The district court implicitly arrived at such a reading. 470 F.Supp. at 548-49
 
 
 [8]
 As demonstrated by the Note, The Meaning of the Southland Exclusion at 452-53, the "being sold" test of subclause II requires actual physical deliveries of gas into interstate commerce, and not just an executory contract to make such a sale. See Falcon Petroleum v. FERC, 642 F.2d 780, 784 (5th Cir. 1981) (contract to sell gas into interstate commerce entered into before May 31, 1978, but gas was not being sold on that date)
 
 
 [9]
 Technically, the entire leasehold was surrendered to the Wylie Heirs. For purposes of this argument, however, this Court will collapse the transactions involved and treat the reversion as a severance of only the deep gas to the Wylie Heirs
 
 
 [10]
 A partial reversion defined according to an undivided percentage or undivided fractional share in the leasehold would not be able to meet the exclusion's "being sold" test in subclause II. The gas attributable to that interest cannot be separately identified; in other words, the interest is a share in all the gas under the leasehold, and therefore some of the reverted gas would be sold with the other gas. See California v. Lo-Vaca Gathering Co., 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965) (physical, molecular commingling of jurisdictional and nonjurisdictional gas will impose Commission jurisdiction over the otherwise nonjurisdictional gas). Subclause II of the exclusion modifies the term "being sold" with the parenthetical qualification "within the meaning of the Natural Gas Act." The "being sold" test thus adopts prior NGA case law, Note, The Meaning of the Southland Exclusion at 452, including the "commingling doctrine" of Lo-Vaca
 
 
 [11]
 This interpretation is consistent with the ability of a producer to split his interest and dedicate only half to interstate commerce. See El Paso Natural Gas Co., FPC Opinion No. 737-A, 54 F.P.C. 917, 918 (1975), rev'd sub nom. Southland Royalty Co. v. FPC, 543 F.2d 1134 (5th Cir. 1976), rev'd sub nom. California v. Southland Royalty Co., 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978) (4-3 decision). There is accordingly no inconsistency in the Allied Chemical Group being a subsequent grantee of the reversioner, and thus free of the original dedication with regard to the deep gas lease reserves, and being a successor in interest to the original dedication with respect to the shallow gas lease reserves, which it has an interest in pursuant to a farmout from the Moffett Group
 
 
 [12]
 This is because the NGPA definition of "committed or dedicated" and the NGPA's exclusions from that definition are to be used only for purposes of applying the NGPA, and not for applying the NGA. Tenneco Exploration, Ltd. v. FERC, 649 F.2d 376, 380 (5th Cir. 1981)
 
 
 [13]
 Allied Chemical was plainly aware of this possibility since Allied's attorneys investigated Columbia's claim that the deep gas was dedicated before rejecting Columbia's demands
 
 
 [14]
 The doctrine of primary jurisdiction promotes proper relationships between the courts and administrative agencies. Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 303, 96 S.Ct. 1978, 1986, 48 L.Ed.2d 643 (1976). It is a discretionary tool of the courts, a flexible concept to integrate the regulatory functions of agencies into the judicial decision making process by having agencies pass in the first instance on technical questions of fact uniquely within the agency's expertise and experience, or in cases whose referral is necessary to secure uniformity and consistency in the regulation of business, such as issues requiring the exercise of administrative discretion. Nader, 426 U.S. at 303-04, 96 S.Ct. at 1986-87; Far East Conference v. United States, 342 U.S. 570, 574-75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952); Mississippi Power & Light Co. v. United Gas Pipe Line Co., 532 F.2d 412, 417 (5th Cir. 1976), cert. denied, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977)
 In this case, the district court's determination on remand with regard to enforcement of a payback obligation for diversions prior to December 1, 1978, will be materially facilitated by FERC's informed evaluation of the meaning of Representative Dingell's enforcement caution and how the facts of this case fit within that caution. See Nader, 426 U.S. at 305, 96 S.Ct. at 1987; Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 305, 93 S.Ct. 573, 582, 34 L.Ed.2d 525 (1973). Considerations of uniformity and technical expertise in the exercise of enforcement discretion make such a referral particularly appropriate in that it permits FERC to develop standards, either on a case-by-case basis or generically, governing enforcement of Southland -type diversions in light of the policies of the NGPA and Representative Dingell's enforcement policy caution.
 
 
 [15]
 Referral of only the question of enforcement with regard to diversions prior to December 1, 1978, is most appropriate in this case. "No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." United States v. Western Pacific Railroad, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). The underlying policies of the doctrine would not be served by its application to all of the regulatory questions in this case
 It is well established that courts need not refer an issue to an agency when the issue is strictly a legal one, involving neither the agency's particular expertise nor its fact finding prowess; the standards to be applied in resolving the issue are within the conventional competence of the courts and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of the case. Nader, 426 U.S. at 305-06, 96 S.Ct. at 1987-88; Board of Education of the City School District of the City of New York v. Harris, 622 F.2d 599, 607 (2d Cir. 1979), cert. denied, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). Furthermore, the
 courts should be reluctant to invoke the doctrine of primary jurisdiction, which often, but not always, results in added expense and delay to the litigants where the nature of the action deems the application of the doctrine inappropriate.... Likewise, when the agency's position is sufficiently clear or nontechnical or when the issue is peripheral to the main litigation, courts should be very reluctant to refer.... Finally, the court must always balance the benefits of seeking the agency's aid with the need to resolve disputes fairly yet as expeditiously as possible.
 Mississippi Power & Light, 532 F.2d at 419. See also Shew v. Southland Corp., 370 F.2d 376, 379-80 (5th Cir. 1966) (agency position clear).
 On balance, this Court is satisfied that only the enforcement issue should be referred to the Commission. This litigation was instituted in 1974. In that same year, Columbia filed a parallel petition for declaratory relief with the Commission. The Commission did not act on this petition, nor did it ask the district court for a referral of the regulatory issues. While it would have been proper for the district court to refer the case to FERC had it been asked to do so, Texas Oil & Gas Corp. v. Valley Gas Transmission, Inc., 608 F.2d 231 (5th Cir. 1979); J. M. Huber Corp. v. Denman, 367 F.2d 104 (5th Cir. 1966), it was only on appeal that FERC for the first time raised the issue of primary jurisdiction. A broader referral in this case at this time would result in further delay and expense in this already lengthy, drawn-out litigation.
 Such expense and delay are not outweighed by any benefit this Court might receive from a broader referral to FERC. Resolution of the nonenforcement regulatory issues are legal and not factual in nature: whether shifting control of dedicated facilities is itself an act of abandonment; whether the term "reversion" in the Southland exclusion encompasses the voluntary surrender of a portion of the leasehold interest defined according to depth; and whether the effective date of the Southland exclusion's protections is December 1, 1978. The last issue has already been decided by this Court. Falcon, 642 F.2d at 784-85. See also Columbia Gas Development, 651 F.2d at 1157 n.14. As for the other issues, FERC's supplemental amicus brief on the merits of the regulatory issues, filed in response to the request of this Court, has already provided this court with FERC's views on all but the enforcement issue. Indeed, by its ability to advise this Court at this time only on the nonenforcement regulatory issues, FERC's supplemental brief implicitly narrowed FERC's primary jurisdiction doctrine claim to the enforcement issue. In addition to FERC's views on the legal issues in this case, this Court has the benefit of a comprehensive examination of the interpretative problems posed by the Southland exclusion in a well-respected law review. Note, The Meaning of the Southland Exclusion. Finally, this Court already has experience in dealing with the Southland exclusion. Falcon Petroleum v. FERC, 642 F.2d 780 (5th Cir. 1981). Resolution of the nonenforcement regulatory issues is thus within the conventional competence of this Court.
 Nor would our resolution of the nonenforcement issues endanger the Commission's ability to uniformly and consistently regulate the businesses entrusted to its control. FERC is not faced with any problem in which its interpretation of the nonenforcement issues would be a necessary element in the resolution of the problem. Cf. Mississippi Power & Light, 532 F.2d at 419-21 (referral appropriate for issue of damage suit by customer against pipeline for curtailment of deliveries, at time when Commission was developing curtailment policy, because such damage suits could disrupt resolution of curtailment problem). It is only the problem of discretionary exoneration from enforcement that involves the primary jurisdiction doctrine's policy of uniform and consistent regulation.
 
 
 [16]
 Our comparison of the facts of this case with the hypothetical situation that clearly is within Representative Dingell's caution is in no sense intended to be a holding or intimation thereof as to whether the Wylie Heirs, Toce, and the Allied Chemical Group should be exonerated from liability, or a prediction of the ultimate result. What range of possible situations is within and without the enforcement caution is something we leave to FERC. However, since exoneration of liability is a matter within FERC's considered discretion, such issues should be treated as if presented by way of a petition under 18 C.F.R. § 1.7(b), which provides for waivers from any Commission rule or regulation promulgated under the NGA. Denials of § 1.7 relief are reviewable under the abuse of discretion standard, which limits review to ascertaining whether there is a rational basis for and substantial evidence supporting the agency's determination. Columbia Gas Development, --- F.2d at ---- n.18. FERC must therefore clearly set out the grounds that form the basis for the denial of discretionary relief. Id